UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CONSEJO de DESARROLLO ECONOMICO de MEXICALI, AC; CITIZENS UNITED FOR RESOURCES AND THE ENVIRONMENT; and DESERT CITIZENS AGAINST POLLUTION,<br><br>        Plaintiff,<br><br> v.<br><br>UNITED STATES OF AMERICA; GALE NORTON, SECRETARY OF THE DEPARTMENT OF THE INTERIOR; and JOHN W. KEYS III, COMMISSIONER OF THE BUREAU OF RECLAMATION,<br><br>        Defendants. | CV-S-05-0870-PMP (LRL)<br><br>O R D E R RE:<br>MOTION TO DISMISS |

   This action was commenced on July 19, 2005, by Plaintiffs' Complaint for Injunctive and Declaratory Relief challenging the final authorization of the All-American Canal Lining Project (AACLP). On February 9, 2006, this Court dismissed Counts 1-4 and 6-8 of Plaintiff's original Complaint for lack of standing (#161). Plaintiffs filed an Amended Complaint on February 23, 2006 (#177). Plaintiffs' Amended Complaint seeks injunctive and declaratory relief and asserts eight claims: unconstitutional deprivation of water rights (Count 1); constitutional tort (Count 2); equitable apportionment/use (Count 3); estoppel (Count 4); violation of the National Environmental Protection Act ("NEPA") and the Administrative Procedures Act ("APA") (Count 5); Endangered Species Act ("ESA") violations (Count 6); unlawful take of a listed migratory bird species (Count 7); and

1  violation of the San Luis Rey Indian Water Rights Settlement's Act's replacement measures
2  (Count 8). Defendants and Defendant Intervenors[1] have filed Motions to Dismiss Counts 1-
3  4 and 6-8 of Plaintiffs' Amended Complaint for lack of standing and also contend that
4  Counts 5 and 7-8 are time barred.[2]

## I. JURISDICTION AND STANDING

In assessing Defendants' Motions to Dismiss the claims set forth in Plaintiffs' Amended Complaint, the Court applies the same legal standards concerning the limits of its jurisdiction and Plaintiffs' standing to bring the instant claims as it applied in its prior Order regarding Defendants' Motion to Dismiss (#161).

### A. Counts 1 through 4.

#### 1. Fifth Amendment Standing

Plaintiff CDEM argues it has standing to assert Fifth Amendment claims because some of its members are United States citizens and Fifth Amendment rights extend to foreign property owned by a United States citizen.[3] Defendants respond that Plaintiff

---

[1] Defendant Intervenors are Central Arizona Water Conservation District ("CAWCD"), Imperial Irrigation District ("IID"), San Diego County Water Authority ("SDCWA"), and the State of Nevada, Southern Nevada Water Authority, and Colorado River Commission of Nevada (the "Nevada Intervenors") (collectively "Defendant Intervenors").

[2] Defendants filed Federal Defendants' Supplement to Motion to Dismiss Plaintiffs' First Amended Complaint ("Defs.' Supplemental Mot. to Dismiss" [Doc. #222]) on March 13, 2006. On March 13, 2006, CAWCD and the State of Arizona filed CAWCD's and State of Arizona's Notice of Motion and Motion to Dismiss (Doc. #220); IID filed its Supplemental Brief RE Dismissal of the First Amended Complaint (Doc. #224); SDCWA filed its Motion to Dismiss First Amended Complaint and Joinders (Doc. #231); and the Nevada Intervenors filed their Supplement to Motion to Dismiss (Doc. #233). Plaintiffs filed their Supplemental Opposition to Defendants' Motions to Dismiss First Amended Complaint (Doc. #245) on March 23, 2006. Defendants and Defendant Intervenors filed their Supplemental Replies (Doc. ## 251, 252, 258, 263, 267, 268) on March 31, 2006.

[3] Plaintiffs also argue that Defendants' and Defendant Intervenors' failure to raise this issue in their motions to dismiss the Amended Complaint "constitutes a waiver." (Opp'n at 5.) However, "lack of subject matter jurisdiction is a non-waivable defect." Gibson v. Chrysler Corp., 261 F.3d 927, 948 (9th Cir. 2001) (citing Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 377 n.21 (1978). Moreover, "federal courts are under an independent obligation to examine their own jurisdiction, and

1  CDEM has not demonstrated that any of its members are United States citizens and points
2  to Plaintiff CDEM's Articles of Incorporation that prohibit foreign persons, i.e., non-
3  Mexican citizens, from belonging to CDEM.
4      Standing does not depend "on the merits of the plaintiff's contention that particular
5  conduct is illegal." Warth, 422 U.S. at 500 (citation omitted). Rather it rests on both the
6  source and nature of plaintiff's claim. Id. "It is well established that certain constitutional
7  protections available to persons inside the United States are unavailable to aliens outside of
8  our geographic borders." Zadvydas v. Davis, 533 U.S. 678, 693 (2001) (citing United
9  States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990); Johnson v. Eisentrager, 339 U.S.
10 763, 784 (1950)). The United States Supreme Court has "rejected the claim that aliens are
11 entitled to Fifth Amendment rights outside the sovereign territory of the United States."
12 Verdugo-Urquidez, 494 at 268. Additionally, "[n]either the Constitution nor the laws
13 passed in pursuance of it have any force in foreign territory unless in respect of our own
14 citizens . . . and operations of the nation in such territory must be governed by treaties,
15 international understandings and compacts, and the principles of international law." United
16 States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936) (internal citation omitted).
17     Plaintiff CDEM and its members are Mexican citizens asserting interests in property
18 located in the Mexicali Valley, Baja California, Mexico, outside the United States'
19 sovereign territory. (Am. Compl. ¶ 1; Ex. A.) Although Plaintiffs allege "[t]he
20 membership of CDEM . . . comprises both U.S. and Mexican citizens," (Am. Compl. ¶ 1),
21 CDEM's Articles of Incorporation prohibit "foreign person[s]" from participation in
22 CDEM:
23   ARTICLE FIFTY SEVEN. – "No foreign person, physical or legal, may have
     any social participation in the Civil Association" that constitutes the Mexicali
24

25 standing 'is perhaps the most important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v. City of
   Dallas, 493 U.S. 215, 231 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750 (1984)) (alteration in
26 original).

3

> Economic Development Council, A.C.  "If by any reason one of the aforementioned persons by any means acquires a social participation, violating what is established in the prior paragraph, in this act it is agreed that said acquisition will be annulled, and consequently cancelled and said social participation and the titles that represent it will have no value, considering the capital reduced in an amount equal to the cancelled participation.

(Supplemental Opp'n, Decl. of Rene Acuna, Ex. A, Mexicali Economic Dev. Council, A.C., Articles of Incorporation, Chapter 10, Art. 57 (punctuation marks in original).) Additionally, none of the declarations offered by Plaintiff CDEM contain statements by the Declarant that he or she is both a United States citizen and a CDEM member. (Supplemental Opp'n, Decl. of Rene Acuna; Decl. of Richard Elmore.)   Because Plaintiff CDEM's allegation that some of its members are United States citizens is conclusory and, in fact, contradicted by the declarations and exhibits proffered by CDEM to support standing, the Court is not required to accept the allegation in the Amended Complaint as true.  Accordingly, Plaintiff CDEM has demonstrated only that its members are Mexican citizens.

      Plaintiffs allege Fifth Amendment violations in Counts 1-4.  In count one of the Amended Complaint, Plaintiff CDEM alleges that Defendants' plan to line the All-America Canal constitutes a deprivation of property without due process of law, violating the class's substantive and procedural due process rights under the Fifth Amendment of the United States Constitution.  In count two, Plaintiff CDEM also claims that the Secretary and Commissioner acted in concert with others to deprive CDEM and the class of their water rights without due process of law under the Fifth Amendment.  In count three, Plaintiff CDEM seeks equitable apportionment and use of the seepage water.  Count four alleges Defendants are estopped from diverting the seepage water for their own use because CDEM and its members possess prior property rights in the water.

      Because the source of counts one through four is the Fifth Amendment of the United States Constitution and Plaintiff CDEM and its members are Mexican citizens asserting

interests in property outside the territory of the United States, the Court does not have jurisdiction over those claims.  The Fifth Amendment does not grant persons in CDEM and its members' position a right to judicial relief.  Therefore, Plaintiff CDEM lacks standing to assert counts one through four.

### 2. Standing under the 1944 Water Treaty

In the Amended Complaint, Plaintiff CDEM states that if Defendants effect their plan for a newly lined All-American Canal, the canal will deprive CDEM and its members of their water rights.  Plaintiff CDEM bases counts one through four on it and its members' purported rights to seepage water from the All-American Canal.  (Am. Compl. ¶¶ 50-54, 57-58, 60, 65 & 68.)  CDEM argues they possess rights to the seepage water through "[p]rior appropriation of the canal seepage; . . . [e]stoppel by reason of the knowledge of all parties of the seepage . . . ; Mexican federal law . . . ; [and] International and equitable concepts of apportionment and comity[.]"  (Id. ¶ 53.)  Defendants and Defendant Intervenors, however, argue the 1944 Treaty governs the allocation of seepage water from the All-American Canal and therefore CDEM has no rights to the water independent of the Treaty.

Plaintiff CDEM responds that the 1944 Water Treaty does not govern the present matter because the Treaty applies only to the initial distribution of water by the United States to Mexico and that IBWC Minute 242, which Congress adopted, implies that the 1944 Water Treaty does not cover groundwater.  Defendants and Defendant Intervenors counter that the 1944 Water Treaty applies to CDEM's claims in Counts 1-4 because the Treaty governs the allocation of seepage water between the United States and Mexico and IBWC Minute 242 does not state that the Treaty does not apply to groundwater or seepage water but rather demonstrates that disputes over Colorado River water between the United States and Mexico are governed by the Treaty and should be submitted to the IBWC.

5

As this Court held in its February 2, 2006 Order, the 1944 Water Treaty between Mexico and the United States allocates all the water of the Colorado River between the two nations, regardless of source:

> Of the waters of the Colorado River, <u>from any and all sources</u>, there are allotted to Mexico:
> (a) A guaranteed annual quantity of 1,500,000 acre-feet (1,850,234,000 cubic meters) to be delivered in accordance with the provisions of Article 15 of this Treaty.
> (b) Any other quantities arriving at the Mexican points of diversion, with the understanding that in any year in which, as determined by the United States Section, there exists a surplus of waters of the Colorado River in excess of the amount necessary to supply uses in the United States and the guaranteed quantity of 1,500,000 acre-feet (1,850,234,000 cubic meters) annually to Mexico, the United States undertakes to deliver to Mexico, in the manner set out in Article 15 of this Treaty, additional waters of the Colorado River system to provide a total quantity not to exceed 1,700,000 acre-feet (2,096,931,000 cubic meters) a year.  Mexico shall acquire <u>no right beyond that provided by this subparagraph by the use of the waters of the Colorado River system</u>, for any purpose whatsoever, in excess of 1,500,000 acre-feet (1,850,234,000 cubic meters) annually.

1944 Water Treaty, Section III, Art. 10 (emphases added).  The Treaty's allotment to Mexico of water from the Colorado River includes sub-surface waters derived from the Colorado River.  Because the Colorado River feeds the All-American Canal, (Am. Compl. ¶¶ 18-25), the Canal is part of the Colorado River system.  Thus, the Treaty governs the Defendants' obligation to Mexico vís-a-vís seepage water from the All-American Canal.

Likewise, Minute 242 of the IBWC reaffirms that the 1944 Water Treaty governs the United States' obligation to Mexico vís-a-vís water derived from the Colorado River. Minute 242 explains that it "[r]efers to the annual volume of Colorado River waters guaranteed to Mexico under the Treaty of 1944, of 1,500,000 acre-feet." Minute 242, Resolution 1, T.I.A.S. No. 7708, 24 U.S.T. 1968 (Aug. 30, 1973).  Accordingly, rather than exempting groundwater or seepage water from the requirements of the 1944 Water Treaty, Minute 242 applies the Treaty to a Colorado River water dispute between Mexico and the United States.  <u>Id.</u>

6

1   Only parties to a treaty may seek enforcement of the treaty and may do so only
2   through diplomatic means.  See, e.g., The Headmoney Cases, 112 U.S. 580, 598 (1884);
3   Botiller v. Dominguez, 130 U.S. 238, 247 (1889).  Moreover, "'even where a treaty
4   provides certain benefits for nationals of a particular state . . . individual rights are only
5   derivative through the states.'"  United States v. Valot, 625 F.2d 308, 310 (9th Cir. 1980)
6   (quoting United States ex rel. Lujan v. Gengler, 510 F.2d 62, 67 (2d Cir. 1975) (internal
7   quotation omitted)).  Minute 242 provides that parties must resolve disputes under the 1944
8   Water Treaty through diplomatic means:

> With the objective of avoiding future problems, the United States and Mexico shall consult with each other prior to undertaking any new development of either the surface or the groundwater resources, or undertaking substantial modifications of present developments, in its own territory in the border area that might adversely affect the other country.

Minute 242, Resolution 6, T.I.A.S. No. 7708, 24 U.S.T. 1968 (Aug. 30, 1973).

Plaintiff CDEM's Counts 1 through 4 are based on its alleged rights to seepage water derived from the Colorado River.  (Am. Compl. ¶¶ 50-54, 57-58, 60, 65 & 68.)  Allocation of seepage water from the Colorado River is governed by the 1944 Water Treaty.  Because the 1944 Water Treaty provides no individual rights and does not contain provisions which would allow individuals to sue under the Treaty, CDEM cannot assert rights under the Treaty.  Accordingly, Plaintiff CDEM has failed to assert an injury in fact that this Court may redress and lacks standing under the 1944 Water Treaty.

### 3. Standing under the APA

Plaintiff CDEM also contends it has standing to assert claims 1, 3, and 4 under the APA because CDEM only has to show that one of its members is an aggrieved person. Defendants respond that the Court "should not entertain these arguments because Plaintiffs did not even invoke the APA in their second round of pleadings." (Defs.' Reply at 7 (citing City of Las Vegas v. Clark County, Nev., 755 F.2d 697, 704 (9th Cir. 1985)).  In City of Las Vegas, the Ninth Circuit Court of Appeals declined to reach the issue of whether the

7

district court had jurisdiction under the APA because "the complaint neither mention[ed] the APA nor point[ed] to a particular agency action or administrative record for the court to review, and [was] 'insufficient to state a claim for judicial review of agency action.'" City of Las Vegas, 755 F.2d at 704 (quoting Scott v. City of Hammond, 741 F.2d 992, 995 (7th Cir. 1984)). Plaintiffs did not mention the APA in Counts 1-4 nor did Plaintiffs point to particular agency action or the administrative record other than to state that the Defendants' plan to construct a lined All-American Canal would deprive CDEM and its members of their water rights. Accordingly, Counts 1, 3, and 4 do not sufficiently allege jurisdiction under the APA. As a result, the Court will dismiss Counts 1-4 for lack of standing

### B.     Counts 6-8

Defendants and Defendant Intervenors argue the Court should dismiss Counts 6-8 of the Amended Complaint because Plaintiffs CDEM and CURE lack standing to assert claims under the ESA, Migratory Bird Treaty Act, and San Luis Rey Act. Specifically, Defendants and Defendant Intervenors argue that CDEM and CURE have failed to establish an injury in fact and that CDEM and CURE failed to assert interests that are germane to their organizational purposes. Plaintiffs CDEM and CURE respond that they have standing because they have established that they or their members "own property, live, work, enjoy the habitat and directly suffer from the acts of the United States if this Court does not intervene."

A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. "[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (citing Warth, 422 U.S. at 2211). If an organization's injury is a frustration of its organizational purposes, the organization also must assert an injury beyond "a setback to the organization's abstract social interests." See id. (citing Sierra Club v. Morton, 405 U.S. 727, 739 (1972)); see also Smith v. Pac.

Properties & Dev. Corp., 358 F.3d 1097, 1105 (9th Cir. 2004) (stating Havens stood for the proposition that "an organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular housing discrimination in question.") (citations omitted). However, an organization may assert claims on behalf of its members if it demonstrates "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc., 528 U.S. at 180-181 (citing Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. at 183 (quoting Sierra Club, 405 U.S. at 735) (other citations omitted).

In Pacific Northwest Generating Co-op. v. Brown, the Ninth Circuit found that although the Pacific Northwest Generating Co-op asserted environmental injuries to it and its employees, it lacked standing to bring environmental claims because its organizational purpose was economic and not environmental. 38 F.3d 1058, 1063 (9th Cir. 1994). Similarly, in Ranchers Cattlemen Action Legal Fund Stockgrowers of America ["R-CALF"] v. United States Department of Agriculture, the Ninth Circuit held that R-CALF lacked standing to bring environmental claims because "economic issues [were] highly relevant to its purpose" and unconnected to the environmental interests R-CALF sought to assert. 415 F.3d 1078, 1104 (9th Cir. 2005).

### 1. **Plaintiff CDEM**

Plaintiff CDEM alleges that its members live near and recreate at the wetlands that allegedly will be affected by the canal lining project and that its members will be harmed directly by the take of listed species and loss of habitat for endangered species caused by the

canal project, in violation of the ESA. (Am. Compl. ¶ 101.) Plaintiff CDEM also alleges that its members will be harmed by the take of migratory birds that will result from the canal lining project, in violation of the Migratory Bird Treaty Act. (Id. ¶ 110.) Finally, Plaintiff CDEM alleges that its members will be harmed by the Defendants' alleged failure to mitigate for the loss of wildlife in the wetlands adjacent to the canal lining project, in violation of the San Luis Rey Act's replacement measures. (Id. ¶ 115.

Plaintiffs have failed to show that these environmental interests it seeks to protect are connected to CDEM's organizational purpose. In their Amended Complaint, Plaintiffs state "CDEM is a non-profit organization of business and civic leaders that promotes sustainable economic growth to improve the quality of life for 1.3 million citizens in the Mexicali Valley Baja California, Mexico." (Am. Compl. ¶ 1.) CDEM's stated purpose is to promote the economic interests of its members in Mexicali, Baja California, Mexico:

> a). - Elaborate the Strategic Plan for the Economic Development of the City of Mexicali; b). - Make the implementation Programs of these strategic and great vision plans for the economic growth and development of Mexicali; c). - . . . plans for the economic growth and development of Mexicali; d). - Pursue promote and execute all types of plans, programs, legal actions . . . for the promotion of investment projects in the Mexicali Baja California municipality; e). - To pursue and promote the execution of investment projects . . . ; f). - . . . promote and execute educational and formational programs for the training of employees and entrepreneurs in Mexicali Baja California; . . . .

(Supplemental Opp'n, Ex. A., Articles of Incorporation, Mexicali Economic Dev. Council, A.C., Art. 5.) The environmental interests CDEM seeks to assert in Counts 6-8 are not germane to CDEM's economic-related purposes. Nor has CDEM shown how the Defendants' potential take of listed species, potential take of migratory birds, and failure to mitigate for the loss of wetlands will frustrate its stated organizational purpose of promoting the economic interests of Mexicali residents. Accordingly, Plaintiff CDEM lacks standing to assert Counts 6-8 and the Court will grant Defendants' and Defendant Intervenors' motion to dismiss Counts 6-8 as to Plaintiff CDEM.

### 2. Plaintiff CURE

In the Amended Complaint, Plaintiffs allege "Defendants' violations of legal requirements pose an imminent threat to the aesthetic, wildlife and environmental values of CURE members and its Board of Directors, some of whom live, work, or recreate in at or in the vicinity of the project." (Am. Compl. ¶ 3.) Regarding Count 6 (violation of the ESA), Plaintiffs allege that the loss of listed wetlands and wildlife will harm Plaintiff CURE's environmental interests and organizational purpose. (Id. ¶ 101.) Regarding Count 7 (unlawful take of a migratory bird species), Plaintiffs assert that CURE's organizational goal of protecting such wildlife will be frustrated by the take of migratory birds caused by loss of wetlands. (Id. ¶ 110.) In Count 8, Plaintiffs assert Defendants' alleged failure to mitigate or make plans for replacing wetlands and wildlife that will be lost as a result of the canal lining project will harm CURE's organizational goals of protecting such wildlife and wetlands. (Id. ¶ 115.)

The environmental interests Plaintiff CURE asserts are germane to its organizational purpose. CURE's stated objectives and purposes are as follows:

> The primary objectives and purposes of this corporation shall be to promote balanced land use and conservation of environmentally sensitive natural resources in the United States and other countries through the education, scientific testing, litigation, acquisition (as appropriate), and all other means permitted under RTC Section 23701d and Internal Revenue Code Section 501(c)(3).

(Supplemental Opp'n, Decl. Malissa Hathaway McKeith, Ex. B, Bylaws, Citizens United for Resources and the Environment, Inc., Art. 2 § 1.) The President of CURE, Malissa Hathaway McKeith, in a signed declaration, also asserts that "CURE has expended over $100,000 in connection with [efforts to require Defendants to mitigate the impacts of the canal lining] . . . ." (Supplemental Opp'n, Decl. Malissa Hathaway McKeith at ¶ 4.) Accordingly, CURE has alleged an injury in fact.

Plaintiff CURE also has alleged sufficiently that its environmental injuries are fairly traceable to Defendants and that its injuries likely will be redressed by a favorable decision from this Court.  In Counts 6 and 7, Plaintiffs allege that the Defendants' plan to re-construct and line the All American Canal will result in the loss of wetlands, listed wildlife and plant species, and result in the taking of migratory birds.  Additionally, Plaintiffs allege that, when planning the project, Defendants failed to mitigate the loss of wildlife and wetlands, in violation of the San Luis Rey Act (Count 8) and that the failure to mitigate will cause CURE's environmental injuries.  A favorable decision by this Court likely would redress Plaintiff CURE's injuries because Defendants would be required to comply with the ESA, Migratory Bird Treaty Act, and the San Luis Rey Act by mitigating the loss of wildlife, wetlands, and listed species.  Therefore, Plaintiff CURE sufficiently has pleaded facts to support its standing to bring Counts 6-8.

**II.    Statute of Limitations**

Title 28 U.S.C. § 2401(a) provides, in part: "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  "'Under federal law, a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action.'" Gibson v. United States, 781 F.2d 1334, 1344 (9th Cir. 1986) (quoting Cline v. Brussett, 661 F.2d 108, 110 (9th Cir. 1981)).

**A.    Counts 7-8**

In Count 7 of the Complaint, Plaintiffs allege Defendants' plan to reconstruct and line the All-American Canal will effect a taking of migratory birds in violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-711, because the Defendants failed to promulgate regulations excepting the agency from the Act's requirements.  In Count 8, Plaintiffs claim Defendants violated the San Luis Rey Act's replacement measures.  P.L. 100-675, 102 Stat. 400.  Defendants, IID, and the Nevada Intervenors move to dismiss,

arguing claims seven and eight are time-barred.[4]

All parties agree the six year statute of limitations set forth in 28 U.S.C. § 2401(a) applies to claims seven and eight.  However, the parties disagree as to the date of accrual. Defendants argue the period of limitations for both claims began to run on July 29, 1994, when the Bureau of Reclamation's director approved the ROD with its accompanying FEIS. Regarding Count 7, Plaintiffs respond that because the ROD did not explicitly authorize the taking of migratory birds, "the administrative action triggering judicial review had not yet been in taken" in 1994.  Plaintiffs also argue that because the agency "re-examined" the ROD in 1999 and 2003, the "paper approval of [the] ROD" in 1994 did not begin to run the statute of limitations.   Plaintiffs point to no alternative date of accrual, merely asserting that they filed the present action within the six-year period of limitation.

Plaintiffs knew or had reason to know that the construction and lining of the new All-American Canal could effect an unlawful take of a listed migratory bird on July 29, 1994.  The Regional Director of the Bureau of Reclamation approved the ROD, supported by its accompanying FEIS, on July 29, 1994.  The FEIS was noticed in the Federal Register on April 14, 1994.  (59 Fed. Reg. 18,573 (Apr. 19, 1994)).  The ROD announced that the agency had decided to construct and line the canal and that re-constructing and lining the canal would have impacts on the environment and special status species, as well as on Mexico.   Plaintiffs therefore were on notice of the injury which is the basis of claim seven because the ROD alerted Plaintiffs to the fact that the agency had decided to re-build and line the canal and Plaintiffs specifically allege "[b]oth the FEIS and recent scientific evidence indicate that listed migratory bird species will be taken or killed by the proposed

---

[4] Defendants and Plaintiffs previously addressed the time bar in their pleadings relating to the motions to dismiss the original Complaint.  The parties have incorporated their prior briefs into the current pleadings concerning the motions to dismiss the Amended Complaint and specifically refer the Court to the prior briefs on the statute of limitations issue.  (Defs.' Supplemental Mot. to Dismiss at 3-4; Supplemental Opp'n at 1.)  Additionally, IID and the Nevada Intervenors assert Counts 7-8 are time-barred in their Supplemental Motions to Dismiss.

13

new canal project." (Am. Compl. ¶ 108.) Plaintiffs should have known of their injury at the time of the FEIS because the FEIS acknowledged that migratory birds would be taken or killed and the agency had not permitted the taking of the birds through regulation.

Plaintiffs point to an agreement between the Federal Government and Southern California agencies as demonstrating the agency's "re-examination" of the 1994 ROD and FEIS. (Mem. in Opp'n to Defs' Mot. to Dismiss at 18 n.13 [citing Quantification Settlement Agreement and Related Agreements and Documents to which the Federal Government and So. California Agencies are Signatories, www.iid.com/water/qsa2003/qsa_agreement_fed.pdf].) The document, however, is not a re-examination of the 1994 ROD and FEIS, but rather a series of settlement agreements regarding Colorado River water between the United States Government and various Southern California water districts and authorities.

Plaintiffs specifically acknowledge that the 1994 FEIS indicated that listed migratory birds would be taken or killed by the canal project and that it knew that regulations had not authorized the agency to take migratory birds. Likewise, the Plaintiffs explicitly recognize the 1994 ROD and FEIS as the basis of claim eight. In their Complaint, Plaintiffs state: "The Secretary and Commissioner's plans for the construction of a new canal [violate the San Luis Rey Act Replacement Measures]. The FEIS and ROD do not account or mitigate for thousands of acres of bi-national and Mexican wetlands lost in the Aldines Dunes, and utilizes the wrong standard in FEIS for analyzing replacement measures." (Am. Compl. ¶ 112.) Hence, Plaintiffs had reason to know of the agency's alleged violation of the San Luis Rey Act when the Director signed the ROD on July 29, 1994. Plaintiffs initiated the present suit on July 19, 2005, over ten years after they knew or should have known the basis for Counts 7 and 8, and well outside the six-year period of limitations proscribed by 28 U.S.C. § 2401(a). The Court therefore will dismiss Counts 7 and 8 as untimely.

///

**B.     Count 5**

In their Supplemental Motion to Dismiss, Defendants argue that Plaintiffs' challenges to the adequacy of the 1994 FEIS are time-barred because Plaintiffs did not file the present suit until July 19, 2005, over ten years after the FEIS.[5] Plaintiffs do not respond.[6] Count 5 of the Amended Complaint alleges, in part, Defendants violated NEPA and the APA because the 1994 FEIS failed to "consider important water rights issues and fail[ed] to rigorously explore reasonable alternatives that would have accommodated both water rights conflicts and serious environmental concerns" and those failures were arbitrary, capricious and an abuse of discretion.[7]  (Am. Compl. ¶¶ 79-81.)

Plaintiffs knew or had reason to know, in 1994, that the FEIS failed to consider important water rights issues and failed to explore alternatives as required by NEPA and the APA because the FEIS was noticed in the Federal Register on April 14, 1994.  59 Fed. Reg. 18,573 (Apr. 19, 1994).  Plaintiffs filed their suit challenging, in part, the FEIS on July 19, 2005.  (Compl. [Doc. #1].)  Therefore, Plaintiffs' challenge in Count 5 to the 1994 FEIS is time barred because Plaintiffs filed it well after the six-year period of limitations set forth in 28 U.S.C. § 2401(a).  Accordingly, the Court will dismiss Count 5 as to Plaintiffs' claims challenging the adequacy of the 1994 FEIS.

---

[5]   Defendants assert this argument in their Supplemental Motion to Dismiss and incorporate their briefing on this issue from their Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment (Doc. #229).

[6]   Plaintiffs respond neither in their Supplemental Opposition nor in their Reply and Response to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment (Doc. #272).

[7]   Count 5 also alleges that Defendants' continuing failure to prepare a supplemental environmental document violates NEPA and the APA.  (Am. Compl. ¶ 82.)  The Court will not address this portion of the claim because the Defendants have not moved to dismiss it.

### III. CONCLUSION

IT IS THEREFORE ORDERED that Federal Defendants' Supplement to Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. #222), CAWCD's and State of Arizona's Notice of Motion and Motion to Dismiss (Doc. #220), Imperial Irrigation District's Supplemental Brief RE Dismissal of the First Amended Complaint (Doc. #224), San Diego County Water Authority's Motion to Dismiss First Amended Complaint and Joinders (Doc. #231), and the Nevada Intervenors' Motion to Dismiss (Doc. #233) are GRANTED with respect to Counts 1-5, and 7-8.

IT IS FURTHER ORDERED that Defendants' foregoing Motions are also GRANTED with respect to claims advanced on behalf of Plaintiff Consejo de Desarrollo Económico de Mexicali's contained in Count 6.

IT IS FURTHER ORDERED that Defendants' foregoing Motions are DENIED with respect to the claims advanced by Plaintiff Citizens United for Resources and the Environment in Counts 6-8.

DATED:    June 23, 2006

_____
PHILIP M. PRO
Chief United States District Judge

16