1

2

3

4                          UNITED STATES DISTRICT COURT

5                                DISTRICT OF NEVADA

6                                      * * *
                                         )
7   CONSEJO de DESARROLLO                )
    ECONOMICO de MEXICALI, AC;           )
8   CITIZENS UNITED FOR RESOURCES        )      2:05-CV-0870-PMP (LRL)
    AND THE ENVIRONMENT; and             )
9   DESERT CITIZENS AGAINST              )
    POLLUTION,                           )           ORDER RE:
10                                       )      SUMMARY JUDGMENT
             Plaintiffs,                 )
11                                       )
    v.                                   )
12                                       )
    UNITED STATES OF AMERICA; GALE )
13  NORTON, SECRETARY OF THE             )
    DEPARTMENT OF THE INTERIOR; and )
14  JOHN W. KEYS III, COMMISSIONER       )
    OF THE BUREAU OF RECLAMATION, )
15                                       )
                                         )
16           Defendants.                 )
                                         )
17  _____ )
                                         )
18  CITY OF CALEXICO,                    )
                                         )
19           Plaintiff-Intervenor,       )
                                         )
20  IMPERIAL IRRIGATION DISTRICT;        )
    SAN DIEGO COUNTY WATER               )
21  AUTHORITY; CENTRAL ARIZONA           )
    WATER CONSERVATION DISTRICT;         )
22  STATE OF NEVADA; SOUTHERN            )
    NEVADA WATER AUTHORITY; and          )
23  COLORADO RIVER COMMISSION of         )
    NEVADA,                              )
24                                       )
             Defendant-Intervenors.      )
25  _____ )

26

A long history precedes this action commenced July 19, 2005, by Plaintiffs' Complaint for Injunctive and Declaratory Relief challenging the final authorization of the All-American Canal Lining Project (AACLP).

The Mexicali Aquifer underlies both the Imperial Valley in California and the Mexicali Valley in Mexico.  Prior to 1901, waters from the Colorado and Alamo rivers recharged the Mexicali aquifer.  In 1901, the Alamo Canal was constructed through the channelization of the Alamo River and because it was unlined, the river continued to recharge the aquifer.  In 1928, Congress authorized the Bureau of Reclamation to build a canal wholly within the United States.

The All-American Canal, which was completed in 1942, is located in California's Imperial Valley and provides a route through which Colorado River water is delivered to the Imperial Valley and Mexico.  The All-American Canal is unlined and provides as much as eleven to twelve percent of the recharge water to the Mexicali Aquifer, which underlies both the Imperial Valley in California and the Mexicali Valley in Mexico.

In 1944, the United States and Mexico entered into a water treaty that allocated the waters of the Colorado River between the two countries.  See Treaty between the United States of America & Mex. Respecting Utilization of Waters of the Col. & Tijuana Rivers & of the Rio Grande ["1944 Water Treaty"], 59 Stat. 1219, T.S. No.  994, Section III, Art.  10 (Nov. 8, 1945).  The 1944 Water Treaty committed to the International Boundary and Water Commission ("IBWC") the power to resolve disputes arising under the Treaty.  Id., Arts. 2, 24(d).  It also requires the United States to deliver 1.5 million acre-feet of Colorado River water to Mexico.  Id., Art. 10.

In 1988, Congress passed the San Luis Rey Indian Water Rights Settlement Act which authorized the Secretary of the Interior "to construct a new lined canal or to line the previously unlined portions of the All American Canal . . . or construct seepage recovery facilities . . . . "  Pub. L. No. 100-675, 102 Stat. 4000, § 203.  Congress authorized the

action because "significant quantities of water currently delivered into the All-American

Canal and its Coachella Branch are lost by seepage from the canals and that such losses

could be reduced or eliminated by lining these canals."  Id. § 201.  After conducting

environmental studies considering the impacts the All-American Canal lining project and

other alternatives, including a no-action alternative, the Bureau of Reclamation

("Reclamation") issued its Final Environmental Impact Statement ("FEIS") which was

noticed in the Federal Register in March 1994.  59 Fed. Reg. 18,573 (Apr. 19, 1994).

Reclamation approved the Record of Decision ("ROD") authorizing the All-American

Canal lining project on July 29, 1994.  (AR 1.)  Subsequent to the issuance of the ROD,

Reclamation and the United States section of the IBWC have engaged in diplomatic

interchange with Mexico and the Mexican section of the IBWC.  (Mem. in Supp. of United

States' Mot. to Dismiss Counts 1-4 and 7-8 [Doc. #36], Exs. 6-10; AR 7586.)

At the time of the 1994 FEIS, California was using over five million acre feet of

Colorado River Water per year, well over its normal year apportionment of 4.4 million acre

feet of water per year.  (AR 7595.)  In 2002 to 2003, the Federal Defendants and California

water agencies "began an intensive effort to assist California in reducing its historical

overuse of Colorado River Water."  (Id.)  On October 10, 2003, the Federal Defendants and

other parties entered into an Allocation Agreement Among the United States of America,

the Metropolitan Water District of Southern California, Coachella Valley Water District,

Imperial Irrigation District, San Diego County Water Authority, the La Jolla, Pala, Pauma,

Rincon & San Pasqual Bands of Mission Indians, the San Luis Rey River Indian Authority,

the City of Escondido & Vista Irrigation District ("Allocation Agreement").  (Imperial

Irrigation Dist.'s Request for Judicial Notice & Lodgment of Exs. in Supp. of its Mot. to

Intervene & Mot. to Dismiss ["IID Exs."] [Doc. #45], Ex. 8.)  The Allocation Agreement

"pertains to the allocation of water conserved by the planned lining of the All-American

Canal, which carries water from the Colorado River to [Imperial Irrigation District's

3

("IID")] service area."  (Decl. of Mark Hattman [Doc. #199-3], Ex. 1 at 15-16.)  The

Allocation Agreement "provide[s] for the allocation of an amount of Colorado River water

equal to the amount conserved from the Title II works . . . . "[1]  (IID Exs., Ex. 8 at 315.)

Under the Allocation Agreement, the Secretary of Reclamation ("the Secretary")

must determine when the lining of the All-American Canal is complete and determine the

amount of water available for allocation as a result of the All-American Canal lining

project:

> The Secretary will determine the completion of the lining of each canal reach
> . . . .  The Secretary will determine the amount of Colorado River water
> available for allocation as a result of lining each canal reach . . . The Secretary
> will send a notice of reach completion for each canal reach to the Parties as
> each such reach is completed and . . . include in the notice the Secretary's
> determination as to the amount of water available for allocation as a result of
> lining that reach.

(IID Exs., Ex. 8 at 328.)   The Secretary also must "deliver Colorado River water available

for allocation as a result of the Projects each Calendar Year for the benefit of the San Luis

Rey Settlement Parties . . . . "  (Id., Ex. 8 at 331.)  The Allocation Agreement also provides:

> If for any reason work on the All-American Canal Lining Project is
> terminated prior to lining the All-American Canal or construction of a new
> concrete-lined canal . . . the Secretary, after consultation with the Parties,
> shall deem the Project to be complete and will determine the amount of
> Colorado River water available for allocation from that Project.

(Id., Ex. 8 at 328.)

Additionally, the Allocation Agreement contains a clause limiting the manner and

venue in which parties can present disputes with the United States pursuant to the

Allocation Agreement:

> Disputes under this Allocation Agreement involving the United States shall be
> presented first to the Regional Director of the Lower Colorado Region of the

---

[1]    Title II refers to Title II of the San Luis Rey Indian Water Rights Settlement Act which authorized the Secretary of the Interior "to construct a new lined canal or to line the previously unlined portions of the All American Canal . . . or construct seepage recovery facilities . . . . "  Pub. L. No. 100-675, 102 Stat. 4000, § 203.

> Bureau of Reclamation . . . .  The decision of the Regional Director shall be subject to appeal to the Commissioner . . . .  The decision of the Commissioner shall be subject to appeal to the Secretary . . . .  The decision of the Secretary may then be appealed to the federal courts to the extent permitted by and in accordance with federal law.

(Id., Ex. 8 at 367.)  On November 13, 2003, IID filed an amended complaint in California state court to validate the Allocation Agreement pursuant to California law and 43 U.S.C. § 390uu.   The validation proceedings in California state court are ongoing but currently stayed pending resolution of certain motions on appeal.  (Decl. of Mark Hattman, Ex. 8.)

On September 9, 2004, Reclamation requested Fish and Wildlife Services ("FWS") to confirm as a biological opinion a conference opinion that FWS issued on February 8, 1996 regarding the effects of the All-American lining project on the Peirson's milk-vetch.[2] (AR 7648.)  FWS confirmed the conference opinion as a biological opinion on January 10, 2006 because no significant information or changes existed that would alter FWS's prior opinion.  (Id.)  On November 18, 2005, Reclamation issued a Biological Analysis for the All-American Canal Lining Project, Potential Species Impact in the Republic of Mexico, which FWS reviewed and concluded Reclamation was not required to consult with FWS regarding transboundary effects.  (AR 7654, 7697.)  On January 12, 2006, Reclamation issued a Supplemental Information Report ("SIR") regarding the lining project.  In the SIR, Reclamation determined that no substantial changes, significant new information, or

---

[2]  The Rule listing the Peirson's milk-vetch as threatened describes the plant as follows: Astragalus magdalenae var. peirsonii [Peirson's milk-vetch] is a stout, short-lived perennial reaching 20 to 70 cm (8 to 27 in) high. The stems and leaves are covered with fine silky hairs and the leaves are 5 to 15 cm (2 to 6 in) long, with 3 to 13 small oblong leaflets.  The flowers are dull purple, arranged in 10- to 17- flowered racemes and the resulting pods are 2 to 3.5 cm (0.8 to 1.4 in) long, inflated, with a triangular beak.
   . . .
Astragalus magdalenae var. peirsonii grows in the Sonoran Desert, on the slopes and hollows of windblown dunes . . . .  it is known from the Borrego Valley, in San Diego County, and the Algodones Dunes, in Imperial County, which extend just south of the International Border into northeastern Baja California (Westec 1977).
63 Fed. Reg. 53596, 53599 (Oct. 6, 1998).

1  circumstances existed that would require Reclamation to issue a supplemental

2  environmental impact statement ("SEIS").  (AR 7575.)

3        Plaintiffs Consejo de Desarollo Económico de Mexicali ("CDEM"), Citizens United

4  for Resources and the Environment ("CURE"), and Desert Citizens Against Pollution

5  ("DCAP") filed suit in this Court on July 19, 2005, seeking injunctive and declaratory relief

6  and asserting eight claims.  On February 9, 2006, the Court dismissed Counts 1-4 and 6-8 of

7  Plaintiffs' original Complaint, which Plaintiffs subsequently amended.  On June 26, 2006,

8  the Court dismissed Counts 1-4, and 7-8 of Plaintiffs' Amended Complaint, Count 5 as it

9  relates to the 1994 FEIS, and Plaintiff CDEM from Count 6 for lack of standing.  The Court

10  granted Plaintiff in Intervention status to the City of Calexico, California as to Count 5.

11  The remaining claim asserted by all Plaintiffs is violation of the National Environmental

12  Protection Act ("NEPA") for failing to issue a SEIS (Count 5).  Plaintiff CURE also asserts

13  a claim for violation of the Endangered Species Act ("ESA") (Count 6).

14        Plaintiffs move for summary judgment as to Count 5 arguing Defendants violated

15  NEPA by failing to issue a SEIS because significant new information, circumstances, and

16  substantial changes exist requiring Reclamation to issue a SEIS.  Plaintiff CURE also

17  moves for summary judgment as to Count 6 arguing new information exists requiring

18  Reclamation to reinitiate formal consultation with FWS under the ESA.

19        Federal Defendants and Defendant Intervenors oppose Plaintiffs' motions for

20  summary judgment and cross-move for summary judgment arguing that no significant new

21  information, circumstances, or substantial changes exist requiring Reclamation to issue a

22  SEIS.  Federal Defendants oppose Plaintiff CURE's motion for summary judgment and

23  cross-move for summary judgment as to Count 6 arguing Reclamation fulfilled its

24  consultation obligations under the ESA, and that no new information exists that would

25  require Reclamation to re-initiate formal consultation with FWS.  Defendant-Intervenor IID

26  also asserts this Court should abstain from deciding this case pursuant to the Colorado River

and the <u>Younger</u> doctrines.[3]

I.    **MOTIONS TO LIMIT REVIEW, ALLOW DISCOVERY, TO STRIKE & EVIDENTIARY OBJECTIONS**

Federal Defendants move to limit the scope of review to the Administrative Record and to request the Court to issue an order protecting Federal Defendants from discovery.

_____

[3]    Currently before the Court are Plaintiff CDEM's Motion for Summary Judgment, or Alternatively, for Preliminary Injunction (Doc. #155); Plaintiffs CURE and DCAP's Motion for Summary Judgment, or Alternatively, for Preliminary Injunction (Doc. #152); Federal Defendants' Corrected Opposition to Plaintiffs' Motions for Summary Judgment or Preliminary Injunction, and in Support of Federal Defendants' Cross-Motion for Summary Judgment (Doc. #229); and Memorandum of Points and Authorities in Support of Imperial Irrigation District's Cross-Motion for Summary Judgment and/or Stay of Action as to the First Amended Complaint (Doc. #211).

The parties filed the following oppositions and replies: Imperial Irrigation District's Supplemental Opposition to Plaintiffs' Motion for Preliminary Injunction and/or Summary Judgment (Doc. #237); Supplemental Response of CAWCD and State of Arizona in Opposition to Plaintiffs' Motion for Summary Judgment or Preliminary Injunction, and in Support of Federal Defendants' Cross-Motion for Summary Judgment (Doc. #239); DCAP & CURE's Combined Reply RE: Cross Motions for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction on NEPA Air Quality Claims (Doc. #257); Intervenor City of Calexico's Reply and Motion to Join in Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Alternative Motion for Preliminary Injunction (Doc. #264); Plaintiffs' Combined Reply to Oppositions of Central Arizona Water Conservation District and Arizona, the Metropolitan Water District of Southern California and the Imperial Irrigation District and San Diego County Water Authority to Plaintiffs' Preliminary Injunction and/or Summary Judgment (Doc. #270); Combined Reply and Response of Plaintiffs' CDEM and CURE to Federal Defendants' Opposition to Motion for Summary Judgment or Preliminary Injunction and Cross Motion for Summary Judgment (Doc. #272); and Imperial Irrigation District's Reply to Plaintiffs' Opposition to Cross-Motion for Summary Judgment (Doc. #285).

The following joinders to the motions before the Court have been filed:  Desert Citizens Against Pollution's Joinder in Motion for Summary Judgment or Preliminary Junction (Doc. #153); Nevada Intervenors' Joinder to the Federal Defendants' Opposition to Plaintiffs' Preliminary Injunction and/or Summary Judgment (Doc. #208); Defendant-Intervenor San Diego County Water Authority's Joinder to Imperial Irrigation District's Cross-Motion for Summary Judgment and/or Stay of Action (Doc. #226); Defendant-Intervenor San Diego County Water Authority's Joinder to the United States of America's Opposition to Plaintiffs' Motion for Summary Judgment or Preliminary Injunction and Cross-Motion for Summary Judgment (Doc. #230); Nevada Intervenors' Joinder in Federal Defendants Opposition to Plaintiffs' Motion for Summary Judgment (Doc. #236); Defendant-Intervenor San Diego County Water Authority's Joinder to Imperial Irrigation District's Opposition to Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment (Doc. #242); DCAP's Joinder in CDEM's Reply Briefs (Doc. #261); and Defendant-Intervenor San Diego County water Authority's Joinder to Imperial Irrigation District's Reply to Pls.' Cross-Motion for Summary Judgment (Doc. #289).

(United States' Mot. to Limit the Scope of Review to the Admin. R. & for Protective Order [Doc. #34].)  The Court granted in part and denied in part the motion pending the resolution of the motions to dismiss.  (November 1, 2005 Order [Doc. #98].)  Plaintiffs seek discovery and to supplement the Administrative Record.  (Pls.' Mot. to Supp. the Admin. R. [Doc. #99].)  Defendants also move to strike various declarations Plaintiffs submitted.  (Fed. Defs.' Mot. to Strike Pls.' Decls. & Docs. [Doc. #218].)

Plaintiffs move for judicial notice of various documents submitted with CDEM and CURE's motion for summary judgment.  (Request for Judicial Notice in Supp. of Mot. for Summ. J. or Prelim. Inj. [Doc. #152].)  Plaintiffs also request the Court to deem undisputed Plaintiffs' Statement of Undisputed Material Facts attached to Plaintiffs DCAP and CURE's motion for summary judgment because neither the Federal Defendants nor the Defendant Intervenors opposed it.  (Reply Re: Pls.' Separate Statement of Undisputed Material Facts [Doc. #259].)  Additionally, Plaintiffs move for leave to file Craig Morgan's Declaration.  (Pls.' Mot. for Leave to Late File the Decl. of Craig Morgan in Supp. of Pls.' Mot. for Summ. J., or Alternatively, for Prelim. Inj. [Doc. #281].)  Finally, Defendant-Intervenor San Diego County Water Authority ("SDCWA"), IID, and Plaintiffs object to various declarations and exhibits.

**A. Supplementing the Administrative Record/Allowing Discovery**

In reviewing agency decisions, courts should "typically focus[] on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."  The Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005) (quoting S.W. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996)).  Nonetheless, in an action to compel agency action unlawfully withheld or unreasonably delayed "review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record."  Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir.

2000) (quotation omitted).  The United States Court of Appeals for the Ninth Circuit has

articulated narrow exceptions to the general rule limiting review to the administrative

record:

> (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."

The Lands Council, 395 F.3d at 1030 (quoting S.W. Ctr. for Biological Diversity, 100 F.3d

at 1450).

Defendants argue that because Plaintiffs challenge agency action, this Court's review

is limited to the Administrative Record.  They also argue the Administrative Record is

sufficient to show the agency's decision-making process.  Plaintiffs assert discovery is

necessary to determine whether the Administrative Record is complete.  Additionally,

Plaintiffs argue they should be allowed to supplement the Administrative Record because

Reclamation failed to consider all of the relevant factors and information in making its

decisions not to re-initiate formal consultation and not to issue a SEIS.  Plaintiffs further

contend Reclamation has acted in bad faith by failing to consider the Andrade Mesa

Wetlands when it knew of the wetlands' existence or to consider the lining project's

impacts on Mexico.

Because the remaining claims are actions to compel agency action unlawfully

withheld, the Court will not limit its review to the Administrative Record and instead will

consider materials submitted by Plaintiffs as they relate to the present matter.  Specifically,

the Court will consider those materials concerning whether Reclamation acted arbitrarily or

capriciously in failing to issue a SEIS or re-initiate consultation with FWS.   However, the

Court will not permit discovery because Plaintiffs have failed to show that discovery is

necessary to determine whether the agency has considered all the relevant factors, that the

agency has relied on documents not in the record, to explain technical terms or complex

subject matter, or that the agency has acted in bad faith. Accordingly, the Court will grant Plaintiffs' motion to supplement the Administrative Record with admissible materials relating to Plaintiffs' NEPA and ESA claims and will deny Defendants' motion to limit the scope of review to the Administrative Record. Further, the Court will deny Plaintiffs' request for discovery and grant Defendants' protective order.

**B.  Motions to Strike**

Federal Defendants also move to strike the declarations of Paul Rosenfeld, Steven Larson, and Edward Glenn attached to Plaintiffs' motions for summary judgment because Federal Defendants argue the declarations are "wholly inappropriate in a record review case." (Fed. Defs.' Mot. to Strike Pls.' Decls. & Docs. at 2.) Federal Defendants assert the Court should strike the Declarations of Jane Williams, Stephanie Pincetl, and Fred Cagle, Enrique Rovisora, Ricardo Hinojosa, and Michael Abatti to the extent they opine about the sufficiency of Reclamation's environmental documents. For the reasons discussed above, the Court may review extra-record materials to determine whether Reclamation considered all the relevant factors and information in making its decision whether to issue a SEIS or re-initiate formal consultation with FWS. Accordingly, the Court will deny Defendants' motion to strike.

**C.  Motion for Judicial Notice**

Plaintiffs DCAP and CURE move the Court to take judicial notice pursuant to Federal Rule of Evidence 201 of the following documents: California Department of Health Services Environmental Health Investigations Branch October 2005 Imperial County Asthma Profile; Clean Air Initiative Second Community Survey Report Imperial County & Mexicali dated June 2005; United States [EPA] Final and Proposed Rules re Finding of Failure to Attain and Reclassification to Serious Nonattainment Imperial Valley Planning Area dated August 11, 2004; California Air Resources Board PM10 Trends Summary: Salton Sea Air Basin; California Air Resources Board PM10 Trends Summary: Brawley-

Main Street; California Air Resources Board PM10 Trends Summary: Westmoreland – W 1st Street; Imperial County Air Pollution Control District ["ICAPCD"] Rules 800 and 801; South Coast Air Quality Management District Rule 403; [ICAPCD] Air Quality handbook dated February 2005; County of Imperial Second Amended Petition for Writ of Mandate in <u>County of Imperial v. [IID], et al.</u>; South Coast Air Quality Management District and [ICAPCD]'s Petition for Writ of Mandamaus in <u>SCAQMD v. State Water Resources Control Board, et al.</u>; Sixty Day Notice Letter of [CURE] dated May 17, 2005; Sixty Day Notice Letter of [DCAP]; United States EPA's 1995 AP 42 Compilation of Air Quality Pollutant Emission Factors section 13.2.2; United States EPA's 1995 AP 42 Compilation of Air Quality Pollutant Emission Factors section 13.2.3; and United States EPA's 1995 AP 42 Compilation of Air Quality Pollutant Emission Factors section 13.2.4.  Plaintiffs do not set forth any argument supporting their request for judicial notice.  Federal Defendants argue the Court should not take judicial notice of these documents because the Court should limit its review to the Administrative Record and the documents reflect ongoing and developing scientific research, information which typically is not the type of facts for which judicial notice is appropriate.

Federal Rule of Evidence 201 provides:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

A Court may take judicial notice of the fact that a public record exists but may not otherwise take judicial notice of the disputed facts contained therein.  <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 690 (9th Cir. 2001).  Therefore, to the extent that Plaintiffs request the Court to take judicial notice of the listed documents' existence, the Court will do so.  However, absent Plaintiffs identifying to specific facts within the documents that are appropriate for judicial notice, the Court will not take judicial notice of any facts or

information contained within those documents.

### D.  Separate Statement of Undisputed Facts

Plaintiffs CURE and DCAP argue that pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, the Court should deem undisputed the undisputed statement of material facts they attached to their motion for summary judgment.  Defendant Intervenor IID counters that the Court should deny Plaintiffs' request because IID opposed those facts in its supplemental opposition to summary judgment and that nothing in Federal Rule 56 or Local Rule 56-1 requires parties to file a separate document disputing the facts or to dispute each fact opposing parties list as undisputed.  Moreover, IID argues Federal Defendants and Defendant Intervenors contest Plaintiffs' alleged undisputed facts in their pleadings and briefs.

Nothing in Federal Rule of Civil Procedure 56 or Local Rule 56-1 requires litigants to file a separate document disputing opposing parties' statement of undisputed facts.  See Fed R. Civ. P. 56; Local Rule 56-1.  Accordingly, the Court will deny Plaintiffs CURE and DCAP's request to deem undisputed their Undisputed Statement of Material Facts.

### E.  Motion for Leave to Late File

Plaintiffs move for leave to file the Declaration of Craig W. Morgan arguing good cause exists to allow late filing because the declarant's information first came to Plaintiffs' attention on April 4, 2006.  Defendant Intervenor SDCWA counters the Court should not allow Plaintiffs to file the declaration because Plaintiffs have not stated sufficiently good cause or excusable neglect.  Federal Defendants argue the Court should deny Plaintiffs leave to file because the declaration is outside the Administrative Record, the information in the declaration was based on information known to the parties prior to April 4, 2006 and Plaintiffs waited to file the declaration until after they filed their reply brief, and Plaintiffs have not filed a memorandum of points and authority to support their motion.

Federal Rule of Civil Procedure 6(b) provides:

> When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect

In considering whether excusable neglect exists, a district court must consider the following criteria: "the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993).

The Court will grant Plaintiffs leave to file the declaration and consider it to the extent it is relevant to whether Reclamation considered all relevant factors in deciding not to issue a SEIS or reinitiate formal consultation with FWS. The declaration will not create a danger of prejudice to Defendants, because no new arguments are presented in the declaration. The declaration contains information concerning Plaintiffs' argument that changes in the canal design pose a threat to human safety, an argument Plaintiffs previously raised in their motion for summary judgment and reply brief. Nor will the delay in filing impact these proceedings because Plaintiffs submitted the declaration only seven days after their Reply and use it for the purpose of rebutting arguments Defendants made in their opposition and cross-motion. Further, the reason for the delay was not within the reasonable control of Plaintiffs because Plaintiffs were not aware of the declarant's specific information until April 4, 2006. Finally, no evidence exists that Plaintiffs acted in bad faith. Federal Defendants have not presented any evidence Plaintiffs knew about the information prior to that date and Plaintiffs moved for leave to file the declaration within two days of discovering the information. Accordingly, the Court will grant leave to Plaintiffs to late file the

declaration and consider the declaration for the purposes discussed above.

**F.  Evidentiary Objections**

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988)).  Federal Rule of Evidence 402 provides "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules proscribed by the Supreme Court . . . .  Evidence that is not relevant is not admissible."  Evidence is relevant if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter . . . .  [Such evidence] may, but need not, consist of the witness' own testimony."  Fed. R. Evid. 602.  Lay opinion testimony must be "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  An expert witness "qualified as an expert by knowledge, skill, experience, training, or education, may testify" about technical, scientific or specialized knowledge, if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the  facts of the case."  Fed. R. Evid. 702.  An expert may base his or her opinion or inference on facts or data "made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field . . . the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."  Fed. R. Evid. 703.  Opinion testimony "otherwise admissible is not

objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704.

Hearsay is inadmissible unless it meets one of the exceptions or exclusions provided by the Federal Rules of Evidence.  Fed. R. Evid. 802.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801.  Federal Rule of Evidence 901 also requires a proponent to authenticate evidence before a court can admit the evidence. This authentication requirement "'is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'"  Alexander Dawson, Inc. v. N.L.R.B., 586 F.2d 1300, 1302 (9th Cir. 1978) (quoting Fed. R. Evid. 901).  Thus, "[t]he issue for the trial judge under Rule 901 is whether there is prima facie evidence, circumstantial or direct, that the document is what it is purported to be."  Id.

### 1.  SDCWA's Evidentiary Objections

SDCWA objects to certain paragraphs of the declarations of Edward Glenn, Stephanie Pincetl, Michael Abatti, Gaylord Smith and attached exhibits, Heliodoro Gonzalez Villanueva, Victor Smith, and Steven P. Larson, arguing the declarations are irrelevant, lack foundation, argumentative, vague and ambiguous, hearsay, and speculative.  (Evidentiary Objections of [SDCWA] to Decls. of Edward Glen [sic], Nazario Ortiz, Stephanie Pincetl, Enrique Rovirosa, Michael Abatti, Gaylord Smith, Heliodoro Gonzalez Villanueva, and Steven P. Larson [Doc. #196].)  SDCWA also objects to the entire declarations of Nazario Ortiz and Heliodoro Gonzalez Villanueva because they are in Spanish and English and no declaration exists from any competent person that the English versions are true and correct versions of the submitted Spanish versions; and SDCWA objects to certain paragraphs of the declarations because they are irrelevant, lack foundation, and contain legal conclusions. (Id.)

Additionally, SDCWA objects to paragraph four of the Declaration of Edie Harmon arguing it is irrelevant, without foundation, not based on personal knowledge, and inadmissible lay opinion. (Evidentiary Objections of [SDCWA] to Decls. of Edie Harmon, Ricardo Hinojosa, Jane Williams, Fred Cagle, Ph.D., & Paul Rosenfeld, Ph.D. [Doc. #197].) SDCWA also objects to certain paragraphs of the declarations of Ricardo Hinojosa, Jane Williams, Fred Cagle, Ph.D., and Paul Rosenfeld, Ph. D. because they are irrelevant, hearsay, lack foundation and personal knowledge, and offer opinions on ultimate facts. (Id.) SDCWA objects to paragraphs in the Second Declaration of Steven P. Larson because they are irrelevant, referenced documents are in Spanish and no translation is provided, and they lack foundation. (Evidentiary Objections of [SDCWA] to the Second Decl. of Steven P. Larson in Supp. of Pls.' Mot. for Prelim. Inj. [Doc. #274].)

Similarly, SDCWA objects to certain paragraphs of the Declaration of Claire Browning Hervey arguing they are irrelevant. (Evidentiary Objections of [SDCWA] to the Decl. of Claire Browning Hervey in Supp. of Pls.' Mot. for Prelim. Inj. [Doc. #275].) SDCWA objects to paragraphs and exhibits A and B of the Declaration of Osvel Hinojosa-Huerta asserting they are irrelevant, the declarant lacks the necessary credentials to qualify as an expert, and Exhibit B is in Spanish and no translation is provided. (Evidentiary Objections of [SDCWA] to the Decl. of Osvel Hinojosa-Huerta in Supp. of Pls.' Mot. for Prelim. Inj. [Doc. #276]; Supplemental Evidentiary Objections of [SDCWA] to the Decl. of Osvel Hinojosa-Huerta in Supp. of Pls.' Mot. for Prelim. Inj. [Doc. #280].) Finally, SDCWA objects to the entire Declaration of Craig Morton arguing the declaration is irrelevant and lacks foundation. ([SDCWA]'s Objection to the Decl. of Craig Morton Filed in Supp. of Pls.' Mots. for Summ. J. or in the Alternative Prelim. Inj. [Doc. #295].)

### a. Relevance

The majority of SDCWA's relevance challenges to the declarations rest on SDCWA's argument that portions of the declarations are irrelevant because they relate to the lining

project's effects on Mexico and seepage to the Mexicali Aquifer.  SDCWA argues that information is irrelevant because the Court dismissed Plaintiffs' claims asserting rights to the seepage water and that extra-territorial effects are irrelevant because Defendants are not required to examine the effects of the lining project in Mexico.  However, the information about the impacts the lining project will have in Mexico and those impacts' transboundary effects are relevant because they are facts that form the basis of Plaintiffs' claims under NEPA and ESA.  Further, whether Reclamation must examine the extra-territorial effects of the lining project is a legal question for the Court to decide and is an issue still in controversy.  Accordingly, the Court declines to strike the challenged portions of the declarations on that basis.  The Court therefore will deny SDCWA's relevance objections to the declarations of Edward Glenn, Nazario Ortiz, Stephanie Pincetl, Enrique Rovirosa, Michael Abatti, Heliodoro Gonzalez Villanueva, Victor Smith, Steven P. Larson, Edie Harmon, Ricardo Hinojosa, Jane Williams, and Paul Rosenfeld Ph.D.; and to Exhibits C, D, G, I to the Declaration of Gaylord Smith.

The Court also will consider evidence that relates to whether the California validation proceedings are parallel to the present matter and air quality deterioration in the Imperial Valley because such evidence is relevant to IID's summary judgment motion based on abstention.  Accordingly, the Court will deny SDCWA's relevance objections to the declarations of Claire Brown Hervey, Michael Abatti, Fred Cagle, Ph.D., and Paul Rosenfeld, Ph.D.  The Court will sustain SDCWA's objections to the Declaration of Gaylord Smith, Exhibit B, because the exhibit discusses the flat-tailed horned lizard rangewide management strategy.  Evidence concerning the flat-tailed horned lizard is irrelevant because Plaintiffs make no claims concerning the flat-tailed horned lizard in the remaining claims in Counts 5 or 6.

\\\

\\\

**b. Authentication**

The Court will sustain SDCWA's objection to the declarations of Nazario Ortiz and Heliodoro Gonzalez Villanueva because no evidence exists sufficient to support a finding that the matters in question are what their proponent claims. The declarations appear to have been written originally in Spanish and later translated into English. There is no indication that the English versions of the declarations are true and correct translations.

However, the Court will overrule SDCWA's authentication objection to the Second Declaration of Steven P. Larson based on the declaration referencing documents that are written in Spanish. The letters are not offered as evidence, rather they form the basis of Steven P. Larson's opinion. Likewise, the Court will overrule SDCWA's authentication objection to the Declaration of Osvel Hinojosa-Huerta. Exhibit B to the declaration is one of Hinojosa-Huerta's publications and the declarant offers it to demonstrate he is qualified as an expert and not as evidence.

**c. Lack of Personal Knowledge/Expert Opinion Foundation**

The Court will overrule SDCWA's foundation and lack of personal knowledge objections to the Declaration of Edward P. Glenn because the declaration provides the foundation for his opinion. For the same reason, the Court will overrule SDCWA's objections to the declarations of Steven P. Larson, Fred Cagle, Ph.D., Paul Rosenfeld, Ph.D., and Osvel Hinojosa-Huerta, to the extent the declarants do not state legal conclusions. The Court will overrule SDCWA's objection to the Second Declaration of Steven P. Larson and the references to governmental documents in his declaration, because the declaration provides the foundation for his opinion and the information from governmental entities are the type of data reasonably relied upon by hydrologists in forming their expert opinions. The Court also will deny SDCWA's objection to the Declaration of Edie Harmon because the declaration is based on the declarant's personal knowledge.

The Court will sustain SDCWA's foundation and lack of personal knowledge objections to paragraphs five, eight, ten, and eleven of the Declaration of Stephanie Pincetl because the information is not within the declarant's personal knowledge and the declaration does not set forth adequately the basis of the declarant's opinion as to technical, scientific or specialized knowledge.  For the same reasons, the Court will sustain SDCWA's objections to paragraphs two, three, and five through eleven of the Declaration of Michael Abatti; paragraph seven of the Declaration of Victor Smith; paragraph four of the Declaration of Ricardo Hinojosa; and paragraphs five and nine of the Declaration of Jane Williams.  The Court will sustain SDCWA's foundation objections to paragraphs one through eight of the Declaration of Enrique Rovisora and the Declaration of Craig W. Morton because the declarations do not set forth adequately the basis of the declarants' opinions as to technical, scientific, or specialized knowledge.

### d. Hearsay

The Court will overrule SDCWA's hearsay objections concerning the Declaration of Edward P. Glenn because the referenced documents are not offered for the truth of the matter asserted but rather form the basis of the declarant's expert opinion.  Likewise, the Court will overrule SDCWA's hearsay objections to Exhibits C, D, and I, as the Court will not consider the exhibits for the truth of the matter asserted.  The Court will sustain SDCWA's hearsay objection to paragraph six of the Declaration of Victor Smith, to the extent those paragraphs opine about what other United States farming concerns knew or were aware.

### 2.  IID's Evidentiary Objection

IID and SDCWA object to Plaintiffs' submittal of a DVD movie depicting the Mexicali Region and the accompanying Declaration of Victor Hermosillo because Plaintiffs did not serve them with the DVD, and they further assert the DVD is hearsay, lacks oath or affirmation, is improper expert or lay opinion, and is irrelevant.  ([IID's] Objection to Pls.'

Submittal of a DVD Movie to the Ct. as Evid. [Doc. #282].)  Plaintiffs provide the

Declaration of Claire Hervey Re Service of DVD Exhibit to Declaration of Victor

Hermosillo (Doc. #288) which states Plaintiffs inadvertently did not serve parties with the

DVD on March 31, 2006 because the file size was too large to download to the Court's

electronic case filing system.  (Decl. of Claire Hervey Re Service of DVD Ex. to Decl. of

Victor Hermosillo ¶ 4.)  In the declaration, Claire Hervey declares under penalty of perjury

that Plaintiffs subsequently served the parties with the DVD on April 10, 2006.  (Id. ¶ 3.)

Nonetheless, the Court will sustain IID's objections to the DVD movie and the Declaration

of Victor Hermosillo because they are hearsay and do not set forth adequately the basis of

the opinions therein as to technical, scientific, or specialized knowledge.

### 3.  Plaintiffs' Evidentiary Objections

Plaintiffs object to the Declaration of Michael King arguing that the Declaration is

irrelevant, speculative, lacks foundation, and violates NEPA's hard evidence rule by

referring to absent documents.  (Pls.' Objections to Intervenors' Decl. of Michael King

[Doc. #260].)  Additionally, Plaintiffs object to paragraphs of the declarations of  Stephen

Arakawa and Maureen Stapleton, asserting the declarations are irrelevant, speculative, and

lack foundation.  (Pls.' Evidentiary Objections to Decls. of Stephen Arakawa, Maureen

Stapleton, & the Previously Filed Decl. of  Dennis B. Underwood [Doc. #271].)  Plaintiffs

also object to the Declaration of Dennis Underwood, because it is hearsay as the declarant

has died since the filing of the declaration, and argue the declaration also is irrelevant,

speculative, and lacks foundation.  (Id.)

The Court will overrule Plaintiffs' objections to the Declaration of Michael King to

the extent the Declaration discusses how an injunction would harm IID and how the project

construction will comply with air quality guidelines as those are facts in consequence and the

declaration sets forth adequately the basis of the declarant's opinion as to technical,

scientific, or specialized knowledge.  For the same reasons, the Court will overrule

Plaintiffs' objections to the declarations of Stephen Arakawa and Maureen Stapleton. However, the Court will sustain Plaintiffs' objection to the Declaration of Dennis B. Underwood.

## II.  ABSTENTION

Defendant Intervenor IID argues that Plaintiffs' Motion for Summary Judgment is an attack on the Allocation Agreement because its effect is to enjoin the implementation of the Allocation Agreement.  Because the Allocation Agreement is already the subject of an ongoing state court proceeding, IID argues this Court should abstain from deciding the issue and either dismiss the case under the <u>Younger</u> doctrine or stay these proceedings pending the outcome of the state court proceedings pursuant to the <u>Colorado River</u> doctrine.  IID also acknowledges that Plaintiffs could not have brought the NEPA claims under the APA in the validation proceedings, but argues that because IID brought the validation action pursuant to 43 U.S.C. § 390uu[4] the state court has concurrent jurisdiction over the NEPA claims through 43 U.S.C. § 390uu.

Plaintiffs respond that California Courts may validate only actions of California public agencies, not federal agencies.  They also argue that this action does not attack the Allocation Agreement because it attacks Federal Defendants' agency action.  Plaintiffs similarly argue that granting injunctive relief in this action will not invalidate the Allocation

---

[4]  Title 43 U.S.C. § 390uu gives consent to join the United States as a defendant in certain actions regarding a contract executed pursuant to federal reclamation law:

> Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances. Any suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated.

Agreement even if the effect of the relief delays or prevents the Allocation Agreement's implementation.  Finally, Plaintiffs argue they are not parties to the validation proceedings.  Accordingly, Plaintiffs assert neither the Colorado River nor the Younger doctrines apply to this case.

**A.  Younger Doctrine**

The doctrine propounded by Younger v. Harris, 401 U.S. 37 (1971), and its progeny reflects a "strong federal policy against federal interference with ongoing state proceedings." Meredith v. Oregon, 321 F.3d 807, 817, amended by 326 F.3d 1030 (9th Cir. 2003).  A federal district court should abstain under Younger when: 1) state judicial proceedings are ongoing; 2) the proceedings implicate important state interests; and 3) the state proceedings provide the plaintiff with an adequate opportunity to raise federal claims.  Meredith, 321 F.3d at 817.  Even if all of three criteria are met, Younger abstention is not appropriate in all cases.  Application of the Younger abstention doctrine is appropriate only when the federal relief sought would interfere in some manner with the state court proceedings.  Green v. City of Tucson, 255 F.3d 1086, 1094 (9th Cir. 2001) (en banc).

The state proceedings seek to validate the Allocation Agreement.  California Civil Procedure Code provides the following:

> A public agency may upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, and for 60 days thereafter, bring an action in the superior court of the county in which the principal office of the public agency is located to determine the validity of such matter.  The action shall be in the nature of a proceeding in rem.

Cal. Civ. Proc. Code § 860.  "A validation action ([Cal.] Code Civ. Proc., § 860 et seq.) allows a [California] public agency to obtain a judgment that its financing commitments are valid, legal, and binding.  If the public agency has complied with statutory requirements, the judgment in the validation action binds the agency and all other persons."  Friedland v. City of Long Beach, 62 Cal. Rptr. 2d 427, 429 (Cal. Ct. App. 1998).  Thus, if IID succeeded in the validation hearings, it would "obtain a judgment that its financing commitments [under

22

the Allocation Agreement] are valid, legal, and binding" and the judgment would "bind [IID] and all other persons."  See id.

The federal relief Plaintiffs seek, i.e., an injunction requiring Defendants to issue a SEIS and to reinitiate formal consultation with FWS, would not interfere with the state court proceedings.  The matter before this Court addresses whether Federal Defendants violated federal environmental laws by failing to issue a SEIS or re-initiate consultation with FWS.  If this Court were to issue an injunction requiring Federal Defendants to prepare a SEIS or re-initiate consultation, such an injunction would not interfere with a holding by the state court that the Allocation Agreement is binding and IID's financial commitments are valid.  The parties to the Allocation Agreement still would be required to uphold their obligations under the Allocation Agreement.  The Secretary still could determine the completion of the lining of the All-American Canal, determine the amount of water available for allocation as a result of the All-American Canal lining, and deliver any Colorado River water available for allocation as a result of the project.  (IID Exs., Ex. 8 at 328, 331.)  The Allocation Agreement defines the Secretary's duties if the project is terminated, requiring the Secretary to determine the amount of water from the Colorado River available for allocation.  (Id. at 328.)  Because the validation proceedings concern the obligations of the parties under the Allocation Agreement and not whether Federal Defendants complied with federal environmental law, this action would not interfere with the state court validation proceedings.

Furthermore, even if resolution of the matter before this Court would interfere with the state proceedings, Plaintiffs would not have been able to sue Federal Defendants in state court.  First, the Allocation Agreement contains a clause requiring parties to present disputes involving the United States to Reclamation first and then allowing appeals of any decision to the Secretary of the Interior and then to United States district court.  (IID Exs., Ex. 8 at 367.)  Hence, parties may not bring disputes with the United States arising under the Allocation

Agreement in a state court.

Second, 43 U.S.C. § 390uu does not waive the United States' immunity from suit in state courts, rather it allows a party to a contract with Reclamation to sue for enforcement of the contract in federal court. See 43 U.S.C. § 390uu ("Any suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated."); see also United States v. Mitchell, 445 U.S. 535, 538 (1980) ("absent an unequivocal expression of congressional consent to suit, sovereign immunity bars even a claim for non-monetary relief against the government"). Third, 43 U.S.C. § 390uu would not allow Plaintiffs to assert their NEPA or ESA claims against Federal Defendants because 43 U.S.C. § 390uu "waives the United States' sovereign immunity from a declaratory relief action brought by a party to a contract with the United States to establish the party's rights under that contract." Wyoming v. United States, 933 F. Supp. 1030, 1038 (D. Wyo. 1996) (citations omitted). Plaintiffs are not a party to the Allocation Agreement nor do they seek to enforce any rights under the Allocation Agreement. (IID Exs., Ex. 8.) Accordingly, the validation proceedings would not provide Plaintiffs with an adequate forum to litigate their NEPA and ESA claims. Because these proceedings will not interfere with the validation action and the validation action would not provide an adequate forum for Plaintiffs, the Younger doctrine is inapplicable and the Court will not grant IID's motion for summary judgment on that basis.

## B. Colorado River Doctrine

The Colorado River doctrine requires federal courts to stay matters in which there are ongoing parallel state proceedings. Colorado River Water Conserv. Dist. v. United States, 424 U.S. 800 (1976). Exact parallelism is not required but the federal and state proceedings must be "substantially similar." Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989). "Colorado River abstention should be invoked only in 'exceptional circumstances.'" Id. at 1415 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 19 (1983)). However, "[F]ederal abstention and deference to parallel

state proceedings is appropriate under <u>Colorado River</u> even when none of the more established doctrines apply." <u>Fireman's Fund Ins. v. Quackenbush</u>, 87 F.3d 290, 298 (9th Cir. 1996).

The Supreme Court has outlined six factors courts should consider in determining whether the <u>Colorado River</u> doctrine applies:

> (1)  whether either court has assumed jurisdiction over a <u>res</u>; (2) the relative convenience of the forums; (3) the desirability of avoiding piecemeal litigation; . . . (4) the order in which the forums obtained jurisdiction; . . . . (5) whether state or federal law controls[;] and (6) whether the state proceeding is adequate to protect the parties' rights.

<u>Nakash</u>, 882 F.2d at 298 (citing <u>Colorado River</u>, 424 U.S. at 818; <u>Moses Cone</u>, 460 U.S. at 25-26).  Courts should apply the factors "in a pragmatic and flexible way, as part of a balancing test rather than as a 'mechanical checklist.'"  <u>Id.</u> (quotation omitted).

The validation action is not a parallel proceeding to this matter.  As discussed above, the validation action seeks declaratory relief that IID's financing commitments under the Allocation Agreement are valid, legal, and binding.  In this matter, Plaintiffs request injunctive relief requiring Federal Defendants to issue a SEIS and to re-initiate FWS consultation.  In the matter before this Court, federal law controls entirely.  As discussed above, Plaintiffs could not have brought their NEPA or ESA claims through the validation action.  For the same reasons, the state proceeding would not protect adequately Plaintiffs' or Federal Defendants' rights.  Although the state court obtained jurisdiction over the validation action first and consolidating the actions in the state court would avoid piecemeal litigation, that the validation action is not a parallel proceeding and does not protect adequately the parties' rights, weigh against abstention under the <u>Colorado River</u> doctrine. Accordingly, the Court will deny IID's motion for summary judgment on the basis of abstention.

\\\
\\\

**III.  SUMMARY JUDGMENT**

 **A.  Legal Standard**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law defines which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All justifiable inferences must be viewed in the light most favorable to the non-moving party. County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact.  Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 531 (9th Cir. 2000).  The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial.  Id.; Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 997 (9th Cir. 2001).

 **B.  NEPA Violation – Count 5**

Plaintiffs argue Defendants violated NEPA because new information and circumstances concerning the lining project's environmental impacts require Reclamation to prepare a supplement to the 1994 FEIS.[5]  Specifically, Plaintiffs assert Reclamation has failed to address adequately significant new information regarding the Andrade Mesa Wetlands in Mexico and listed species habitating therein, the socio-economic impacts on Mexicali and the rebounding effects on the United States, increased impacts to the Salton Sea, human safety, the deterioration of air quality in the Imperial Valley, and new PM-10 [6]

---

[5]  Because the Court dismissed Plaintiffs' challenges to the 1994 FEIS as time-barred, Plaintiffs' only remaining NEPA claim is that Reclamation improperly failed to issue a SEIS.

[6]  PM-10 is "defined as airborne material having an aerodynamic diameter of 10 microns or less.  Hence, the common abbreviation 'PM-10.'"  Sierra Club v. U.S. E.P.A., 346 F.3d 955, 958 n.2

mitigation measures.  Plaintiffs also argue Defendants may not use the 2006 SIR to address the new information, especially given the lapse of time between it and the 1994 FEIS.

Defendants respond that no SEIS is required because the 2006 SIR concluded no significant new impacts will result from the lining project.  Defendants argue the 2006 SIR adequately considers wetlands and listed species impacts, socio-economic effects, impacts on the Salton Sea, public safety, air quality, and air quality mitigation.  Additionally, Defendants argue foreign impacts and their rebounding effects within the United States do not require Reclamation to prepare a SEIS.

### 1.  Impacts on Mexico & Transboundary Effects

Plaintiffs argue the existence of the Andrade Mesa Wetlands is significant new information that requires the Federal Defendants to issue a SEIS.  Additionally, Plaintiffs argue that impacts on the Andrade Mesa Wetlands would affect listed species, in particular the Yuma Clapper Rail, and that because the Yuma Clapper Rail's habitat is bi-national, the effects will be felt within the United States.  Plaintiffs also argue the loss of seepage water from the All-American Canal will have a devastating effect on the Mexicali economy, which in turn will have rebound effects within the United States, particularly within Calexico, California.

Federal Defendants respond that the Court should dismiss Plaintiffs' claims involving impacts on Mexico because the issue presents a non-justiciable political question.  Federal Defendants also contend NEPA does not require federal agencies to analyze extraterritorial effects and that Reclamation's only obligation to examine impacts in Mexico arose under Executive Order 12114, which does not create a cause of action.  Finally, Defendants assert that Reclamation was not required to examine the project's impacts on Mexico and the rebounding effects because federal agencies only are required to look at the effects of agency

(9th Cir. 2003).

action to the extent of the agency's control or responsibility.   Plaintiffs reply that because significant impacts in the United States will result from the lining project's effects in Mexico, NEPA requires Federal Defendants to prepare a SEIS concerning impacts in Mexico.

### a.  Political Question

The political question doctrine "prevent[s] the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch."  Koohi v. United States, 976 F.2d 1328, 1331 (9th Cir. 1992).  When determining whether a case poses a political question, "courts should undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance."  Alperin v. Vatican Bank, 410 F.3d 532, 545 (9th Cir. 2005) (citing Baker v. Carr, 369 U.S. 186, 211 (1962)), cert. denied sub nom Order of Friars Minor v. Alperin, --- U.S. ----,  2006 WL 88991 (2006).  Accordingly, the United States Supreme Court has suggested six factors to determine whether a case involves a non-justiciable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217.  "Dismissal on the basis of the political question doctrine is appropriate only if one of [the Baker factors] is 'inextricable' from the case."  Alperin, 410 F.3d at 544 (citing Baker, 369 U.S. at 217).

Generally, "'matters relating to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial

inquiry or interference.'" <u>Freedom to Travel Campaign v. Newcomb</u>, 82 F.3d 1431, 1439 (9th Cir. 1996) (quoting <u>Regan v. Wald</u>, 468 U.S. 222, 242 (1984) (citation omitted)). Nevertheless, the Supreme Court has "cautioned against 'sweeping statements' that imply all questions involving foreign relations are political ones." <u>Alperin</u>, 410 F.3d at 545 (quoting <u>Baker</u>, 369 U.S. at 217 (citation omitted)).  For example, the interpretation of statutes involving foreign affairs is a justiciable question even though a decision in the case may have "significant political overtones" because the interpretation of statutes presents a purely legal question.  <u>Japan Whaling Ass'n v. Am. Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986). Further, "interpreting congressional legislation is a recurring and accepted task for the federal courts."  <u>Id.</u>

Federal Defendants argue that whether NEPA requires Reclamation to examine the lining project's impacts on Mexico implicates the political question doctrine because it "interjects this Court into an area that Mexico and the United States have made a matter of diplomatic consultation pursuant to procedures agreed to under the 1944 Treaty."  (Fed. Defs.' Corrected Mem. of P. & A. in Opp'n to Pls.' Mots. for Summ. J. or Prelim. Inj., & in Supp. of Federal Defs.' Cross-Mot. for Summ J. at 53.)  Plaintiffs counter that whether NEPA requires Federal Defendants' to consider impacts in Mexico is irrelevant to the 1944 Water Treaty as NEPA compliance does not constitute a dispute between the United States and Mexico.

Although the United States and Mexico have engaged in diplomatic negotiations regarding the lining project,[7] whether NEPA requires federal agencies to examine extra-territorial impacts is a justiciable controversy because it presents a purely legal question of statutory interpretation.  <u>See</u> <u>Japan Whaling Ass'n</u>, 478 U.S. at 230.  Accordingly, because the political question doctrine is inapplicable, the Court will exercise jurisdiction over the question.

---

[7] Defs.' Mot. to Dismiss (Doc. #36), Exs. 6-10.

**b.  Extraterritorial Application of NEPA**

Plaintiffs argue Defendants admit the significance of the loss of portions of the Andrade Mesa Wetlands[8] is significant and that significant impacts will result to the Yuma Clapper Rail both in Mexico and the United States.  Plaintiffs also argue that the loss of canal seepage will impact negatively the Mexicali's economy, the flow of water to the New River in Mexico which feeds the Salton Sea, and air quality in the Mexicali Valley.  As a result, Plaintiffs argue Defendants must prepare a SEIS.  Federal Defendants argue NEPA does not require them to analyze the lining project's impacts in Mexico because NEPA does not apply outside of the United States.

"Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested."  Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 188 (1993). Title 42 U.S.C. § 4332(C) requires agencies to prepare a detailed report on "major Federal actions significantly affecting the quality of the human environment."  NEPA's Congressional declaration of national environmental policy states:

> it is the continuing policy of the Federal Government in cooperation with State and local governments, and other concerned public and private organizations, . . . to promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future Americans.
> . . . it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may –
> . . .
> (2) assure for all Americans, safe, healthful, productive, and esthetically and culturally pleasing surroundings[.]

42 U.S.C. § 4331(a)-(b)(2).  Nothing in NEPA's language suggests Congress intended NEPA to apply outside United States territory.  To the contrary, the use of "[s]tate and local

---

[8]  The Andrade Mesa Wetlands are "north and northwest of the Mexicali Valley town of Yucatan [Mexico]."  (AR 7666.)

governments" when describing with whom federal agencies must cooperate and "Americans" and "the Nation" when describing who will benefit from NEPA's policies suggests Congress intended NEPA to apply only within United States territory.  Moreover, nothing in the Council on Environmental Quality ("CEQ")[9] regulations promulgated under NEPA indicates clearly that agencies must examine extraterritorial impacts.  See 40 C.F.R. § 1500.1 et seq.

Nonetheless, "[q]uestions involving the reach of Congress' prescriptive jurisdiction are not implicated when the conduct sought to be regulated occurs within the United States." Gushi Bros. Co. v. Bank of Guam, 28 F.3d 1535, 1538 (9th Cir. 1994) (citing Env't'l Def. Fund, Inc. v. Massey, 986 F.2d 528, 531 (D.C. Cir. 1993)).  To determine whether the conduct occurs within the United States, courts "look to the conduct proscribed by the particular legislation and to the impact of the conduct within the United States." Id.  The Ninth Circuit has not addressed what conduct makes NEPA applicable to extraterritorial impacts resulting from agency action within the United States.  Courts that have considered the extraterritorial application of NEPA, in addition to looking at the statute itself, have looked at whether the environmental impacts are wholly extraterritorial, whether the agency action was entirely within United States territory, and whether the United States has legislative control over the impacted area.  See, e.g., Env't'l Def. Fund, Inc., 986 F.2d at 529; Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n, 647 F.2d 1345, 1347-48 (D.C. Cir. 1981); Basel Action Network v. Maritime Admin., 370 F. Supp. 2d 57, 71-72 (D. D.C. 2005); Greenpeace USA v. Stone, 748 F. Supp. 749, 758 (D. Haw. 1990).

If the environmental impacts fall exclusively within a foreign jurisdiction or in an area over which the United States has no legislative control, courts have held NEPA does not

---

[9]  NEPA provided for the creation of the Council on Environmental Quality, to, in part, "to formulate and recommend national policies to promote the improvement of the quality of the environment."  42 U.S.C. § 4342.

apply.  In Natural Resources Defense Council, Inc., the Court of Appeals for the D.C.
Circuit found that NEPA does not "impose[] an . . . EIS requirement . . . with respect to
impacts falling exclusively within foreign jurisdictions."  Natural Res. Def. Council, Inc.,
647 F.2d at 147-48.  Similarly, the United States District Court for the District of Hawaii
found NEPA did not apply to agency actions on foreign soil that would have foreign policy
implications and interfere with a decision by the Executive branch.  Greenpeace USA, 748 F.
Supp. at 761.  In Basel Action Network, the district court determined NEPA did not apply to
agency action occurring on the high seas because the United States does not have
"legislative control over the high seas."  Basel Action Network, 370 F. Supp. 2d at 71-72.

However, if the agency action occurs within the United States and its impact will be
felt in an area over which the United States maintains legislative control, courts have held
that NEPA applies.  In Massey, the D.C. Circuit held that NEPA applied "where the conduct
regulated by the statute occurs primarily, if not exclusively, in the United States, and the
alleged extraterritorial effect" will be felt in a sovereignless area, such as Antartica, over
which the United States has "a great measure of legislative control."  Massey, 986 F.2d at
529.  Additionally, in Greenpeace USA, the district court stated NEPA "may require a
federal agency to prepare an EIS for action taken abroad, especially where United States
agency action abroad has direct environmental impacts within this country, or where there
has clearly been a total lack of environmental assessment by the federal agency or foreign
country involved."  Greenpeace USA, 748 F. Supp. at 761.

Based on the facts here and absent a clear statutory intent to the contrary, NEPA does
not apply to the All-American Canal lining project's environmental impacts in Mexico.
Although the agency action of constructing and lining a new section of the All-American
Canal will occur within the United States, the projects' effects on the Andrade Mesa
Wetlands, the Mexican Yuma Clapper Rail population, the socio-economic situation in
Mexico, groundwater in the Mexicali Valley, seepage flow to the New River in Mexico, and

air quality in Mexico will occur outside United States territory in Mexico, a sovereign nation over which Congress lacks legislative control.  Nor will the loss of seepage water from the canal, result in impacts within the United States directly traceable to agency action, as discussed below.   Additionally, Reclamation assessed impacts in Mexico and so Reclamation has not failed completely to undertake an environmental assessment.  (See AR 7585-87.)  Accordingly, NEPA does not require Reclamation to issue a SEIS examining the All-American Canal project's impacts in Mexico.[10]  Because no genuine issue of material fact exists that Federal Defendants violated NEPA by not preparing a SEIS regarding the project's impacts on the Andrade Mesa Wetlands and other wetlands in Mexico, groundwater levels in Mexico, the socio-economic situation in Mexico, the effects on air quality in Mexico, and any seepage flow to the New River in Mexico, the Court will grant summary judgment in favor of Federal Defendants on those claims.

### c.  Transboundary Impacts

Plaintiffs argue the project's alleged impacts on Mexico will result in significant impacts within the United States, including reduced water flow to the Salton Sea, impacts on the population of Yuma Clapper Rails within the United States, alleged reduced crop importation to the United States, reduction in trade from Mexico, and more illegal immigration.  Plaintiffs also argue that CEQ guidance, consistent with long-standing principles of international law, requires Defendants to consider the trans-boundary effects of its actions.  Defendants argue that impacts in Mexico and their rebound effects within the United States are beyond agency control because of decisions made by Mexico regarding the allocation of its share of water under the 1944 Water Treaty.  Defendants also assert the 2006 SIR properly addresses transboundary impacts under CEQ guidance because to the

---

[10]   The agency argues that it complied with Executive Order 12,114, 44 Fed Reg. 1957 (Jan. 4, 1979).  The Court will not examine whether the agency complied with the Order because the Order does not provide a cause of action and Plaintiffs have not brought a claim under it.

extent CEQ guidance required Reclamation to examine transboundary impacts, it does not require the preparation of a SEIS and only requires agencies to examine transboundary effects to the best of the agency's ability using reasonably available information.

NEPA includes "a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue. This requirement is like the familiar doctrine of proximate cause from tort law." Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 773 (1983). Therefore, "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within § 102 [of NEPA] because the causal chain is too attenuated." Id. at 774. For example, in Metropolitan Edison Co., the Court determined that the agency action's impact on psychological health did not require the agency to issue a SEIS because it involved an "element of risk" that lengthened "the causal chain beyond the reach of NEPA." Id. at 775. In so ruling, the Court reasoned that "the scope of the agency's inquiry must remain manageable if NEPA's goal of ensur[ing] a fully informed and well considered decision, is to be accomplished." Id. at 776 (internal quotation omitted).

Furthermore, "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004) (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 373-74 (1989)). Accordingly, if "the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." Id. (citation omitted). Hence, "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect." Id. at 769. In Public Citizen, the Supreme Court determined the agency had no control over the environmental impact of its challenged action and therefore

NEPA did not require the agency to prepare an EIS, because the legally relevant cause of the impact was not the agency action but action by the President of the United States and Congress over which the agency had no discretion.  Id. at 768-69.[11]

Any transboundary impacts of lining the All-American Canal are too speculative to support causation.  First, the degree to which seepage from the All-American Canal contributes to the Andrade Mesa Wetlands is unknown, although one report estimated that the project would result in the loss of 502.3 acres of the wetlands.  (AR 7698.)  The wetlands "are believed to be fully or partially supported by [All-American Canal] seepage because they are not believed to have existed before the [All-American Canal] was constructed." (AR 7666.)  However, "[s]ome evidence suggests that portions of the [Andrade Mesa Wetlands] would remain after lining."  (AR 7669.)  Moreover, the extent of the lining project's effect on the Andrade Mesa Wetlands is uncertain because "they are about the same distance from the unlined reach [of the project] and the lined reach."  (AR 7670.) Additionally, any impact to the Yuma Clapper Rail population within the Andrade Mesa Wetlands "would represent a small fraction of the entire United States and Mexico population."  (AR 7687.)  Also, because any changes in water level will occur gradually and given the Yuma Clapper Rail's ability "to disperse some distance," the Yuma Clapper Rails "occupying the Andrade Mesa Wetlands "are likely to move to other habitats as the conditions slowly degrade."  (AR 7699.)

\\\

\\\

---

[11]    Plaintiffs argue that the United States District Court for the Southern District of California's decision in Border Power Plant Working Group v. Department of Energy, 260 F. Supp. 2d 997 (S.D. Cal. 2003), requires that Reclamation examine the socio-economic transboundary effects and the transboundary effects on the Salton Sea.  However, that case did not address directly whether the agency possessed control over the environmental impact or state that an agency must assess impacts that are attenuated or speculative.  Id.  Instead, Border Power held that an agency must assess foreseeable, indirect impacts of its action.  Id. at 1013.

Second, although Plaintiffs argue the project will "eliminate the source of water for an entire farming community immediately south of the border[,]"[12] and that loss will result in economic loss to the United States, particularly Calexico, and put increasing migratory and agricultural pressures on the United States, the All-American Canal contributes only eleven to twelve percent of the Mexicali Aquifer's recharge water. (AR 32.) Whether the loss of seepage water will impact the Mexicali Valley to the extent asserted by Plaintiffs is highly speculative in the first instance. Whether that loss will result in socio-economic impacts within the United States is even more speculative.

Third, the causal link between lining the canal and declining water levels in the Mexicali Aquifer or the Andrade Mesa Wetlands are too attenuated given the lack of agency control over Mexico's allocation of water under the 1944 Water Treaty and the extent to which the All-American Canal feeds the aquifer. That Mexico may choose to divert its share of Colorado River water to areas other than the Andrade Mesa Wetlands or the Mexicali Aquifer, or that Mexico may choose to accelerate the rate at which it pumps water from the aquifer, is outside of Defendants' control. Moreover, Defendants do not have any authority to force Mexico to implement mitigation measures that would alleviate the increased salinity, decreased groundwater, or loss of wetlands in Mexico that might occur because of the lining project. Therefore, any impacts the loss of the seepage water may have on Mexico and resulting impacts in the United States are not within agency control but are within the control of Mexico pursuant to decisions it makes regarding its own water resources. Accordingly, more information concerning those impacts would not be useful in the decision making process and no purpose would be served by Reclamation preparing a SEIS concerning the impacts.

\\\

---

[12] Pl. CDEM Mot. for Summ. J., or Alternatively for Prelim. Inj. ("CDEM Mot. for Summ. J.") at 6.

CEQ guidance concerning transboundary effects also does not require Defendants to analyze the lining project's transboundary effects. The CEQ Guidance on NEPA Analyses for Transboundary Impacts provides the following:

> NEPA requires agencies to include analysis of reasonably foreseeable transboundary effects of proposed actions in their analysis of proposed actions in the United States. Such effects are best identified during the agency's scoping stage, and should be analyzed to the best of the agency's ability using reasonably available information. Such analysis should be included in the [environmental assessment] or EIS prepared for the proposed action.

(CDEM & CURE Mot. for Summ. J., Decl. of Gaylord Smith, Ex. H.) It also notes that judicial doctrines interpreting NEPA still apply to agency action:

> Agencies do have a responsibility to undertake a reasonable search for relevant, current information associated with an identified potential effect. However, the courts have adopted a "rule of reason" to judge an agency's actions in this respect, and do not require agencies to discuss "remote and highly speculative consequences." . . . Additionally, in the context of international agreements, the parties may set forth a specific process for obtaining information from the affected country which could then be relied upon in most circumstances to satisfy agencies' responsibility to undertake a reasonable search for information.
> Agencies have also pointed out that certain federal actions that may cause transboundary effects do not, under U.S. law, require compliance with Sections 102(2)(C) and 102(2)(E) of NEPA. Such actions include actions that are statutorily exempted from NEPA, . . . and individual actions for which procedural compliance with NEPA is excused or modified by virtue of . . . various judicial doctrines interpreting NEPA. Nothing in this guidance changes the agencies' ability to rely on those rules and doctrines.

(Id.) As discussed above, because the impacts in Mexico are beyond agency control and their impacts within the United States are too speculative, NEPA's "rule of reason" does not require Reclamation to prepare a SEIS regarding those impacts. Therefore, the Court will deny Plaintiffs' motion for summary judgment based on the foreign impacts of the lining project and their transboundary effects and grant the Defendants' cross-motion for summary judgment on that basis.

\\\

\\\

### 2.  Domestic Impacts

Plaintiffs argue the project's impact on the Salton Sea due to loss of seepage from the canal, the elimination of the escape ridges and its effect on human safety, and the deterioration of air quality within the Imperial Valley constitute significant new information requiring Defendants to issue a SEIS.  Defendants respond that Reclamation properly concluded through the 2006 SIR that no significant new impacts would result from the project and therefore NEPA does not require Defendants to prepare a SEIS.

"NEPA 'is our basic national charter for protection of the environment.'"  Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir. 2001) (quoting Blue Mountains v. Biodiversity Project v. Blackwood, 161 F.3d 1208, 1215 (9th Cir. 1998)).  NEPA and CEQ regulations require federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C). Compliance with NEPA ensures federal agencies will consider significant environmental impacts of federal action, make available the relevant information, and open to public scrutiny their decision making process.  Churchill, 276 F.3d at 1072-73.  "NEPA also emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."  Id. (quotation omitted).

"NEPA imposes on federal agencies a continuing duty to supplement existing . . . EISs in response to 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"  Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 n.2 (9th Cir. 2000) (quoting 40 C.F.R. § 1502.9(c)(1)(ii)); see also Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 529 (9th Cir. 1994).  The regulations implementing NEPA also require agencies to prepare a SEIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns[.]"  40 C.F.R. § 1502.9(c)(1)(I).  Thus, an agency "cannot simply rest on the

original document." Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000). Rather, it must "continue to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" Id. (quoting Marsh, 490 U.S. at 374).

> [T]he decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

Marsh, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)).

"An action to compel an agency to prepare a SEIS is not a challenge to a final agency decision, but rather an action arising under 5 U.S.C. § 706(1), to compel agency action unlawfully withheld or unreasonably delayed." Friends of the Clearwater, 222 F.3d at 560 (quotation omitted). A court should not set aside an agency's decision not to prepare a SEIS unless it was arbitrary or capricious. Marsh, 490 U.S. at 377. The reviewing court considers "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Friends of the Clearwater, 222 F.3d at 556 (quoting Marsh, 490 U.S. at 378). Just as with a review of an original EIS, the court does not substitute its judgment for that of the agency. Id. In making its decision, "[a]n agency need only articulate a rational connection between the facts it has found and its conclusions." Id. at 561 (citing United States v. Louisiana-Pacific Corp., 967 F.2d 1372, 1376 (9th Cir. 1992)). Moreover, if analysis of "factual issues requires a high level of technical expertise, '[courts] must defer to the informed discretion of the responsible federal agencies.'" Laguna Greenbelt, Inc., 42 F.3d at 530 (quoting Marsh, 490 U.S. at 377)).

Neither NEPA nor the regulations implementing NEPA mention SIRs. Idaho Sporting Cong. Inc., 222 F.3d at 566 (citations omitted). "[C]ourts have upheld agency use of SIRs . . . for the purpose of determining whether new information or changed

circumstances require the preparation of a supplemental EA or EIS." Id. (citations omitted). In Marsh, the Supreme Court held that NEPA did not require the defendant agency to prepare a SEIS because the agency had conducted studies that supported its conclusion that "new information was of exaggerated importance." Marsh, 490 U.S. at 384-85. An agency must issue a SEIS, however, if it determines new significant information exists because "SIRs cannot serve as a substitute [for a SEIS]." Id. For example, in Idaho Sporting Congress, Inc., the Ninth Circuit held that the defendant agency violated NEPA because it improperly relied on a SIR to correct deficiencies in an inadequate EIS. Id. at 568.

However, the Ninth Circuit has allowed agencies to use even an untimely SIR to address whether significant new information exists. In Friends of the Clearwater, the Ninth Circuit held that the defendant agency violated NEPA because it issued its SIR after litigation commenced thus failing to evaluate in a timely manner the need for a SEIS. Friends of the Clearwater, 222 F.3d at 559. Nonetheless, the Court did not overturn the district court's order granting summary judgment to the agency because the agency's decision in the SIR that no significant new information existed was not arbitrary and capricious and "it would serve no useful purpose to remand [the] case to the district court for it to order the [agency] to prepare studies that the [agency] already has completed and that cannot be successfully challenged." Id. at 561 (quotation omitted). Accordingly, this Court must determine whether Reclamation's conclusion in the 2006 SIR that there are no significant new circumstances or information bearing on the All-American lining project was arbitrary or capricious.

### a. Salton Sea

Plaintiffs argue Reclamation received new information regarding All-American Canal seepage water and the Salton Sea in 1999 via a hydrology study prepared by a consultant company, Tetra Tech. Defendants counter Reclamation properly concluded in the 2006 SIR that the Tetra Tech report was not reliable.

The Salton Sea is part of the affected environment of the lining project.  (AR 90-91.)
It is "an ecosystem . . . under stress from increasing salinity, nutrient loading, oxygen
depletion, and temperature fluctuations . . . .  Without restoration, the ecosystem will
continue to deteriorate."  (CDEM & CURE Mot. for Summ. J., Decl. of R. Gaylord Smith,
Ex. E.)  On August 31, 1999, an internal Reclamation e-mail discussed a report by consultant
Tetra Tech ("Tetra Tech report") that the Salton Sea Authority commissioned in 1999.  (AR
1745.)  The Tetra Tech report concluded the lining project could reduce ground water flows
to the Salton Sea by approximately 3,000 to 22,000 acre feet per year.  (AR 1745.)  Despite
the information in the Tetra Tech report, the 2006 SIR found that no significant new
circumstances or better information existed that would bear on the lining project's impacts to
the Salton Sea.  (AR 7605.)  Reclamation specifically did not rely on the Tetra Tech report in
the 2006 SIR because evaluations of the Tetra Tech report raised questions about the report
and other studies presented conflicting information:

> the Salton Sea Authority commissioned a 1999 study of the effects of lining
> the All-American and Coachella Canals on the Salton Sea and adjacent
> wetlands (Tetra Tech 1999).  That study involved a groundwater model
> analysis to determine the reduction in inflow to the Salton Sea from lining the
> canals.  The results of that study produced a range of values bordering on
> insignificance.  Reviews of the study and modeling analysis raised questions
> regarding the input to the model and model calibration (Metropolitan 2000).
> For example, as part of the calibration procedure, groundwater levels along the
> model's southern boundary in the Mexicali Valley were raised from actual
> levels by as much as 20 feet.  In addition, the study adopted a subsurface
> inflow value of 8,000 [acre feet per year] under existing conditions, whereas
> Reclamation and the U.S. Geological Survey (and the study's peer review
> panel) concluded that subsurface inflow to the Salton Sea along its east shore
> is practically zero.  Consequently, Reclamation did not rely on the Study's
> projected inflow conclusions in preparing this Supplemental Information
> Report.

(AR 7605.)

Reclamation's decision that no significant new circumstances or information existed
relating to the project's impacts on the Salton Sea was not arbitrary or capricious because
Reclamation articulated a rational connection between the facts found and its conclusion.

The 2006 SIR found that no significant new circumstances or better information existed that would bear on the lining project's impacts to the Salton Sea.  (AR 7605.)  Although the Tetra Tech report stated the project could reduce groundwater flows to the Salton Sea by 3,000 to 22,000 acre feet per year, a separate evaluation of the Tetra Tech report raised questions about the Tetra Tech report's methodology.  (AR 7605.)  Similarly, studies carried out by Reclamation and the U.S. Geological Survey and its peer review panel reached conclusions that conflicted with the Tetra Tech report.  (Id.)  Moreover, this an area in which the agency and the U.S. Geological Survey possess technical expertise and the Court must defer to Reclamation's informed discretion.  See Laguna Greenbelt, Inc., 42 F.3d at 530.  Accordingly, Reclamation did not act arbitrarily or capriciously when it concluded no significant new information or circumstances existed concerning the project's Salton Sea impacts.  Therefore, the Court will deny Plaintiffs' motion for summary judgement relating to potential Salton Sea impacts and grant Defendants' cross-motion for summary judgment relating to Salton Sea impacts.

### b.  Public Safety

Plaintiffs argue that eliminating the large mammal escape ridges from the canal design plan and replacing the ridges with ladders is a substantial change to the 1994 FEIS that requires Defendants to issue a SEIS.  Plaintiffs assert that the design change will threaten human safety.  Defendants respond that the 2006 SIR clearly identified the changes to the canal design and concluded they are not substantial changes or significant new circumstances relevant to environmental concerns or impacts.

The 1994 FEIS proposed the inclusion of  large mammal escape ridges[13] in the canal

---

[13]    The 1994 FEIS described the escape ridges as follows:
Concrete Escape Ridges would be cast on the sideslopes from the top to about halfway down to the canal bottom to provide grip for humans and wildlife.  The ridges would protrude about 1-1/2 inches from the canal lining and be spaced about 18 inches apart.  (AR 64.)

design to combat the drowning risk to large mammals attempting to drink from or cross the canal. (AR 118.) The 1994 FEIS noted a section of the Coachella Canal Prototype Lining Project included such escape ridges and that wildlife biologists tested their effectiveness and "the test showed the escape ridges to be very effective for safe wildlife entry and exit at [the slope of 2-1/2:1]." (Id.) Nonetheless, the 1994 FEIS stated that the ridges might not be as effective for the All-American lining project as for the Coachella project because the latter's slope was flatter. (Id. at 119.) Additionally, the 1994 FEIS noted "the low probability of deer and other large mammals along the canal." (Id.)

The 1994 FEIS also recognized the hazard a concrete-lined canal poses to human safety. (Id. at 142.) "Reclamation standards for canal safety provide for the installation of safety ladders every 750 feet on each side of a canal." (Id. at 143.) The 1994 FEIS proposed instead that the escape ridges be used "for mitigation of the escape hazard to humans in the [canal]." (Id.) Tests on the Coachella project "proved [the ridges] reliable handholds and footholds on a 2-1/2:1 slope." (Id.) The 1994 FEIS assumed the ridges would be as reliable for the All-American project as for the Coachella project but noted "[i]f field testing indicates that the ridges are not completely effective, safety ladders would be added to the canal design in addition to the ridges. The ridges are desirable for wildlife as discussed under 'Large Mammal Escape.'" (Id.)

The current All-American Canal design eliminates the escape ridges and instead proposes safety ladders 375 feet apart on alternating sides of the canal and hazard signage in English and Spanish. (AR 7620-21; 7628-29.) Reclamation eliminated the ridges from the design plan because "Reclamation evaluated the structural integrity of the experimental test section [on the Coachella Canal] with escape ridges and found a number of structural problems . . . [which] could defeat the purpose of the Project." (Id. at 7620.) Additionally, Reclamation has commissioned a study of animal visitation to the canal area and "[o]ne year of deer tracking and aerial surveys has been completed and no sign of deer in the area of the

43

Project has been found.  This tracking study will continue for two years post-Project construction."  (Id.)  As a result, the 2006 SIR concluded the elimination of the ridges was not a substantial change.  (Id.)  The 2006 SIR also concluded the elimination of escape ridges do not constitute significant new circumstances or information relevant to human safety because the design now includes safety ladders, which meet Reclamation standards.  (Id. at 7628.)

Reclamation articulated a rational conclusion between the facts it found and its conclusion that the elimination of the escape ridges was not a substantial change or significant new circumstances or information.  Reclamation found that the ridges had a number of structural problems and the wildlife study of the canal area has shown no sign of deer in the area.  Given that the stated purpose of the ridges were to facilitate large mammal escape, the ridges possess structural problems, and deer have not been sighted in the Canal area, Reclamation's conclusion that eliminating the escape ridge is not a substantial change is reasonable.  Additionally, the 1994 FEIS discussed the possibility that the ridges might not prove effective for the All-American Canal.

Moreover, Reclamation's conclusion that the substitution of the escape ladders for the escape ridges is not a substantial change impacting human safety is not arbitrary or capricious.  The 1994 FEIS made clear that the ridges "[were] desirable for wildlife" and that ladders might have to be added to the design for human safety.  Because testing has shown that the ridges have structural problems, the 1994 FEIS included a discussion of escape ladders for human safety, and the main purpose of the ridges was for wildlife, Reclamation articulated a rational connection between its conclusion that the substitution of the safety ladders for the escape ridges is not a substantial change or significant new information and the facts Reclamation found.  Therefore, the Court will grant Defendants' cross-motion for summary judgment as to the design changes and deny Plaintiff's motion for summary judgment as to the same.

### c. Deterioration of Air Quality in the Imperial Valley

Plaintiffs argue the SIR inadequately addresses significant new information regarding the deterioration of air quality in the Imperial Valley, and, in particular, the EPA's classification of the Imperial Valley as a serious nonattainment area for PM-10.[14]   As a result, Plaintiffs argue NEPA requires Defendants to prepare a SEIS.  Defendants respond Reclamation properly identified and considered the deterioration of air quality in the Imperial Valley and its classification as a PM-10 serious nonattainment area.

In 1987, the United States Environmental Protection Agency ("EPA") promulgated national ambient air quality standards ("NAAQS") governing airborne particulate matter pursuant to the Clean Air Act, 42 U.S.C. §§ 7401-7617q.  Sierra Club v. U.S. E.P.A., 346 F.3d 955, 958 (9th Cir. 2003).   EPA based the NAAQS on studies that showed the harmful health effects of particulate matter.  Id.  For example, "when inhaled, PM-10 particles can penetrate deep into the respiratory tract where they can lodge in the lung tissue and lead to a variety of respiratory problems."  Id. at 962.

Congress amended the Clean Air Act in 1990 to classify areas of the country as attainment or non-attainment for particulate matter and for sub-classification of

---

[14] Plaintiffs argue the 1994 FEIS failed to identify quality standards, baseline Imperial Valley air monitoring data, or PM-10 and diesel fume air data for the lining project. Plaintiffs argue the 2006 SIR improperly attempts to remedy these deficiencies in the 1994 FEIS.  Plaintiffs also argue that the 2006 SIR discusses mitigation measures that appear nowhere in the 1994 FEIS and it does not model or analyze the new measures' effectiveness. Plaintiffs argue this requires a SEIS because a Defendants cannot use a SIR to correct inadequacies in an EIS. Plaintiffs also contend the 1994 FEIS improperly relied on the Imperial County Air Pollution Control District ["ICAPCD"] to analyze mitigation measures through its permit process because ICAPCD does not issue permits and instead requires that analysis of air impacts occur in an EIS.  As a result, Plaintiffs contend the original EIS rests on "false assumptions regarding the cooperation of other agencies . . ." (DCAP & CURE Mot. for Summ. J. at 25 [quoting Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704-05 (9th Cir. 1993)].)  However, the Court has dismissed Plaintiffs' challenge to the 1994 FEIS because Plaintiffs failed to timely challenge it. Thus, the Plaintiffs are limited to challenging the Defendants' failure to prepare a SEIS on the bases outlined in 40 C.F.R. § 1502.9(c)(1).  Therefore, the Court will not consider these challenges because they are based on the 1994 FEIS's inadequacies and not on significant new information, circumstances, or substantial changes.

nonattainment areas as serious or moderate.  Id.  Subsequent to the amendment, the EPA

classified the Imperial Valley as a moderate nonattainment area for PM-10.  Id.  The 1994

FEIS identified Imperial County as a nonattainment area for ozone and PM-10.  (AR 97.)

Regarding the lining project's impacts on air quality and mitigation for those impacts, the

1994 FEIS stated:

> The effect of this alternative on air quality would be temporary, in the form of
> dust created by excavation of the new canal, operation on unpaved roads,
> equipment exhaust emissions, and batch plant emissions of dust and engine
> exhaust.
>          Emissions would be controlled in accordance with regulations of the
> Imperial County Air Pollution Control District ["ICAPCD"].  Permits required
> for the various construction activities would be obtained.  Dust from
> construction activities would be localized and would be controlled by
> sprinkling access roads and work areas with water.

(AR 98.)  In 2003, the Ninth Circuit ordered the EPA to reclassify the Imperial Valley as a

serious nonattainment area for PM-10.  Sierra Club, 346 F.3d at 962.  The EPA re-classified

the Imperial Valley as a serious nonattainment area on August 11, 2004.  (AR 7607.)

ICAPCD adopted new PM-10 regulations in response to the reclassification.  (Id.)

The 2006 SIR identified the classification of Imperial Valley as a serious

nonattainment area and the new ICAPCD regulations as new information.  (AR 7606-10.)

Reclamation conducted a conformity analysis and determined the lining project "conforms

with the applicable State Implementation Plan and complies with the General Conformity

requirements of the Federal Clean Air Act."  (AR 7609-10.)  The contractor selected to

construct the canal must "prepare a Dust Control Plan that incorporates approved and

appropriate mitigation methods, and . . . obtain all applicable permits."  (AR 7610.)  The

2006 SIR concluded:

> The changes in the regulatory environment for air quality do not represent
> significant new circumstances or information relevant to environmental
> concerns and bearing on the Project or its impacts because, as described in the
> AAC Final EIS/EIR, Reclamation and IID had already committed to comply
> with all current requirements and ensure that the construction contractor has
> obtained all applicable permits.

(AR 7610.)

Reclamation's conclusion in the 2006 SIR that the changes in the regulatory environment are not significant new circumstances or regulation is a rational conclusion based on the facts the agency found. The 1994 FEIS acknowledged that the Imperial Valley was a nonattainment area. (AR 97.) The 1994 FEIS apprised the agency and the public that the lining project would require mitigation measures for the project to comply with federal and state air quality standards, even though new regulations may be more stringent. The 2006 SIR notes the reclassification but incorporates the 1994 FEIS's prior recognition that the project would require mitigation measures to continue to comply with federal and state air quality standards. The reclassification from moderate to serious nonattainment has not changed Reclamation's duty to mitigate for PM-10, which both the 1994 FEIS and 2006 SIR recognize. Additionally, Reclamation conducted a study that concluded the project conforms with the applicable state and federal regulations. (AR 7610.) Accordingly, Reclamation articulated a rational conclusion that the classification of the Imperial Valley was not a significant new circumstance or information related to environmental concerns. Because Reclamation's conclusion was not arbitrary or capricious, the Court will deny Plaintiffs' motion for summary judgment relating to the PM-10 serious nonattainment classification and will grant Defendants' cross-motion for summary judgment for the same reasons.

**C. ESA Violations**

Plaintiff CURE argues that the discovery of the Andrade Mesa Wetlands is new information requiring Federal Defendants to re-initiate formal consultation with FWS because the project will result in loss of the wetlands, a critical habitat to the Yuma Clapper Rail. Defendants argue the Court should grant summary judgment in Defendants' favor because Reclamation met its obligation under the ESA. First, Defendants argue the Court should grant summary judgment in favor of Defendants with respect to the Peirson's Milk-

vetch because Plaintiffs "failed to provide any argument in the ESA portion of their summary judgment brief [regarding the Peirson's Milk-vetch]" and FWS's January 10, 2006 biological opinion satisfies any required consultation under the ESA.  (Fed. Defs.' Mot. for Summ. J. at 69.)  Regarding the Yuma Clapper Rail, Defendants argue FWS's January 10, 2006 Biological Opinion properly addresses any impacts to the bird because FWS advised Reclamation that section 7 of the ESA does not require federal agencies to initiate consultation with FWS concerning extraterritorial impacts, rather section 8 of the ESA governs how agencies address transboundary impacts on endangered species.

In response, Plaintiff CURE argues the ESA requires Defendants to reinitiate formal consultation because Defendants admit that the Andrade Mesa Wetlands and their impact on the Yuma Clapper Rail are significant.  Plaintiff CURE also replies that the final critical habitat rule for the Peirson's milk-vetch has been ruled unlawful and thus Reclamation must reinitiate consultation regarding the Peirson's milk-vetch because of this "new critical habitat legal fact."

**1.  Yuma Clapper Rail & Andrade Mesa Wetlands**

As discussed above, "Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested."  Sale, 509 U.S. at 188.  Nothing in the text of Section 7 of the ESA indicates Congress intended the ESA's formal consultation requirement to apply extraterritorially.  See 16 U.S.C. § 1536.  Likewise, nothing in the text of the regulations governing consultation procedures indicates the ESA requires agencies to formally consult with FWS concerning extraterritorial impacts.  See 50 C.F.R. §§ 402.10-402.16.  Further, as Justice Stevens pointed out in his concurring opinion in Lujan v. Defenders of Wildlife, "the only geographic reference in [section 7(a)] is in the 'critical habitat' clause, which mentions 'affected States.'"[15]  504 U.S. 555, 586-87 (1992) (Stevens,

---

[15]    In Lujan, the Court determined the plaintiffs lacked standing to pursue their ESA claims. Although Justice Stevens disagreed and believed the plaintiffs possessed standing, he concurred in the

48

J., concurring).  Thus, agencies need not consult FWS regarding extraterritorial critical habitat and also need not consult FWS regarding extraterritorial endangered species.  See id. at 578-88.[16]

Additionally, unlike section seven, section eight allows the President to "use foreign currencies accruing to the United States Government . . . to provide to any foreign country (with its consent) assistance in the development and management of programs in that country which the Secretary determines to be necessary or useful for the conservation of any endangered species or threatened species . . . ."  16 U.S.C. § 1537(a).  The Act further states "the Secretary, through the Secretary of State, shall encourage" foreign countries to preserve threatened or endangered species, agreements with foreign countries to conserve such species, and foreign persons' conservation practices.  16 U.S.C. § 1537(b).  "Section 9 makes it unlawful to import endangered species into (or export them from) the United States or to otherwise traffic in endangered species 'in interstate or foreign commerce.'"  Lujan, 504 U.S. at 588 (Stevens, J. concurring) (quoting 16 U.S.C. §§ 1538(a)(1)(A), (E), (F)).  "Congress thus obviously thought about endangered species abroad and devised specific sections of the ESA to protect them.  In this context, the absence of any explicit statement that the consultation requirement is applicable to agency actions in foreign countries suggests that Congress did not intend that § 7(a)(2) apply extraterritorially."  Id. at 588.

Finally, nothing in the ESA's purposes suggests Congress intended section seven to apply extraterritorially.  See 16 U.S.C. § 1531(b).  Title 16 U.S.C. § 1531(a) sets forth the congressional findings:

> The Congress finds and declares that–
> (1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic

judgment because he concluded that § 7(a)(2) does not apply to activities in foreign countries.  Lujan, 504 U.S. at 585-86 (Stevens, J, concurring).

[16]  The Court recognizes this is not controlling but finds Justice Stevens' reasoning persuasive.

growth and development untempered by adequate concern and conservation;

(2) other species of fish, wildlife, and plants have been so depleted by this numbers that they are in danger of or threatened with extinction;

(3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

(4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to–

    (A) migratory bird treaties with Canada and Mexico;

    (B) the Migratory and Endangered Bird Treaty with Japan;

    (C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

    (D) the International Convention for the Northwest Atlantic Fisheries;

    (E) the International Convention for the High Seas Fisheries of the North Pacific Ocean; and

    (G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

The findings demonstrate Congress was concerned about the value and benefit of species and their habitat to the United States and its citizens and the harm their loss would cause within the United States. Although the findings declare the United States' pledge to honor international agreements and commitments concerning endangered species, nothing in the text suggests the ESA's requirements apply extraterritorially. Rather, the statute reiterates the United States' sovereign status and makes clear the United States intends to conserve wildlife, fish, and plants facing extinction pursuant to international agreements "to the extent practicable." Because nothing in the ESA, its purposes, or findings manifests a contrary intent, the ESA "appl[ies] only within the territorial jurisdiction of the United States." See Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285 (1949)).

Nonetheless, because "[q]uestions involving the reach of Congress' prescriptive jurisdiction  are not implicated when the conduct sought to be regulated occurs within the United States," the Court must look at the conduct the ESA proscribes and the impact of the conduct within the United States to determine whether the ESA requires Reclamation to consider the lining project's impact on the Yuma Clapper Rail and its habitat, the Andrade Mesa Wetlands.  See Gushi Bros. Co., 28 F.3d at 1538.  Section 7(a) requires federal agencies to consult FWS regarding agency action that will threaten the existence of listed species or their habitat.  16 U.S.C. § 1536(a).  If agency action threatens such species or their habitat, FWS must suggest reasonable or prudent alternatives that an agency could undertake to prevent or mitigate the harm.  16 U.S.C. § 1536(b)(3)(A).  The conduct section 7(a) proscribes is the impact to the listed species or its habitat.

Plaintiff CURE asserts the lining project will threaten the Yuma Clapper Rail because lining the canal will divert seepage water from the Andrade Mesa Wetlands.  The impact to the listed species or its habitat will occur outside of United States territory.  Furthermore, for the same reasons Reclamation lacks control over extraterritorial impacts and their rebounding effects in the United States under NEPA, Reclamation and FWS lack control over impacts to the Andrade Mesa Wetlands and the Yuma Clapper Rail under the ESA. The situation here is similar to that in Defenders of Wildlife v. Norton, where the district court held section 7(a) did not require consultation because "[t]he record contain[ed] no suggestion of a way, with or without consultation, for Reclamation to ensure that more water reaches the listed species in the delta.  The formulas established by the Law of the River strictly limit Reclamation's authority to release additional waters to Mexico, and Section 7(a)(2) of the ESA does not loosen those limitations or expand Reclamation's authority." 257 F. Supp. 2d 53, 67-68 (D. D.C. 2003) (citations omitted).  As discussed previously, the 1944 Water Treaty limits Mexico's share of Colorado River water.  Therefore, even with consultation, Reclamation has no authority to ensure more water reaches the Andrade Mesa

Wetlands and the Yuma Clapper Rail.  Accordingly, section 7(a) of the ESA, 16 U.S.C. § 1536(a), does not require Reclamation to consult with FWS regarding the lining project's impacts on listed species and their habitat located outside of the United States, including the Yuma Clapper Rail and the Andrade Mesa Wetlands.  The Court therefore will grant Defendant's cross-motion for summary judgment regarding Reclamation's duty to consult FWS concerning the Andrade MESA Wetlands and the Yuma Clapper Rail and will deny Plaintiff CURE's motion for summary judgment as to the same.[17]

## 2.  Peirson's Milk-vetch

"Judicial review of administrative decisions under the ESA is governed by Section 706 of the [APA].  Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv., 340 F.3d 969, 973 (9th Cir. 2003) (quoting Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy, 898 F.2d 1410, 1414 (9th Cir. 1990)).

Section 702 requires agencies to insure that any agency action will not threaten the existence of any endangered species, threatened species, or such species' habitat.  16 U.S.C. § 1536(a).  The regulations issued under § 702 require the consulting agency to "determine whether any action may affect listed species or critical habitat."  50 C.F.R. § 402.14.  Agencies must consult formally with FWS if "such a determination is made."  Id.  Formal consultation results in a biological opinion which sets forth FWS's,

> opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.  If jeopardy or adverse modification is found, [FWS] shall suggest those reasonable and prudent alternatives which [FWS] believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

---

[17]   Because Plaintiff CURE does not challenge Defendants' ESA § 8 process, the Court will not address it.

16 U.S.C. § 1536(b)(3)(A).  If FWS determines after consultation that the agency action or reasonable alternatives will not violate 16 U.S.C. § 1536(a)(2) or that "the taking of an endangered species or threatened species will not violate [16 § 1536(a)(2)]," FWS must provide the agency with a written statement in accordance with 16 U.S.C. § 1536(b)(4).[18]  16 U.S.C. § 1536(b)(4).

The federal regulations promulgated in connection with the ESA consultation requirements provide guidance regarding when re-initiation of formal consultation under the ESA is required:

> Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:
> (a) If the amount or extent of taking specified in the incidental take statement is exceeded;
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
> (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
> (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

Defendants argue that FWS and Reclamation properly concluded the section 7(a) consultation regarding the Peirson's milk-vetch because FWS adopted its February 8, 1996 conference opinion as a biological opinion on January 10, 2006 and therefore the Court

---

[18]   Title 16 U.S.C. § 1536(b)(4) provides in pertinent part:
the Secretary shall provide the Federal agency . . . with a written statement that–
> (I)  specifies the impact of such incidental taking on the species,
> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact;
> . . .
> (iv)  sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency . . . to implement the measures specified under clauses (ii) and (iii).

should grant summary judgment regarding the Peirson's milk-vetch.  Plaintiff CURE

responds that the final critical habitat rule for the Peirson's milk-vetch has been ruled

unlawful "in large part" because the rule excluded the area where the new All-American

Canal will be built and "this new critical habitat legal fact, along with the unlawful take of

the plant species found by the Court in <u>Center for Biological Diversity</u>, . . . , clearly triggers

the need for reconsultation pursuant to 50 C.F.R. § 402.16(a)."  (Combined Reply & Resp.

of Pls. CDEM & CURE to Federal Defs.' Opp'n to Mot. for Summ. J. or Prelim. Inj. &

Cross-mot. for Summ. J. at 20.)  To support its contention, Plaintiff CURE cites to <u>Center</u>

<u>for Biological Diversity v. BLM</u>, No. C03-02509SI (N.D. Cal. Mar. 13, 2006).[19]

Reclamation has met its burden of showing that no issue of material fact exists as to

whether Reclamation met its consultation duties regarding the Peirson's milk-vetch under

the ESA.  Reclamation and FWS consulted informally regarding the project and its

alternatives in 1990.  (AR 1613-14.)  In response to Reclamation's request for formal

consultation, FWS issued a Biological and Conference Opinion for the All-American Canal

Lining Project on February 8, 1996.  (AR 1612.)  Although the Peirson's milk-vetch was not

listed at the time of the February 8, 1996 Conference Opinion, the Opinion addressed the

Peirson's milk-vetch because it was a candidate species.  (AR 1622, 7649.)  FWS concluded

the project would not jeopardize the continued existence of the Peirson's milk-vetch

because:

> 1.  Reclamation and the proponent have proposed actions to minimize take of
> the listed and proposed species and the loss of their habitats and to compensate
> for the loss of habitat that would occur.
> 2.  The proposed project would not result in habitat destruction or
> fragmentation that could inhibit recovery.

(AR 1627.)  On September 9, 2004, Reclamation requested FWS to convert the February 8,

1996 Conference Opinion into a biological opinion.  (AR 7648.)  On January 10, 2006, FWS

[19]  The Court presumes Plaintiffs are referring to <u>Center for Biological Diversity v. BLM.</u>, 422 F. Supp. 2d 1115 (N.D. Cal. 2006).

confirmed the February 8, 1996 Conference Opinion as its biological opinion.  (AR 7648.)

The January 10, 2006 Confirmation of the Biological Opinion concluded the project "is not

likely to jeopardize the continued existence of the Peirson's milk-vetch because the

permanent impacts to the milk-vetch habitat have been reduced to 30 acres, and these

impacts will be offset by habitat restoration within the existing canal area on a greater than

acre-for-acre basis."  (AR 7650.)  Because Reclamation formally consulted with FWS and

FWS concluded the project will not jeopardize the Peirson's milk-vetch, no material issue of

fact exists that Reclamation met its consultation obligations.

Furthermore, CURE has not pointed to a genuine issue of fact that Reclamation failed

to consult with FWS, or to a genuine issue of fact triggering Reclamation's duty to reinitiate

consultation.  Although CURE argues the court's decision in Center for Biological Diversity

constitutes a new critical habitat legal fact, CURE's reliance on the case is misplaced.  First,

the plaintiffs in Center for Biological Diversity named FWS as a Defendant and directly

challenged FWS's exemption of certain Bureau of Land Management ("BLM") land from

designation as critical habitat for the Peirson's milk-vetch.  Center for Biological Diversity,

422 F. Supp. 2d 1115.  Plaintiff CURE has not named the FWS as a defendant and does not

allege in the Amended Complaint that FWS's critical habitat rule is unlawful or new

information requiring reinitiation of consultation and therefore it is not part of the claims

Plaintiff CURE alleges.  Rather the Amended Complaint alleges the following regarding the

Peirson's milk-vetch:

> The habitat of the Peirson's milk-vetch is squarely within the area of and
> around the proposed construction site for the new canal.  The Peirson's milk-
> vetch, surviving specimens which still exist within the construction area, is a
> rare plant species threatened with extinction.  The FEIS does not mention, and
> fails to account for, the listing of the Peirson's milk-vetch as a threatened
> plant.  The [FWS] has identified habitat degradation and loss as the leading
> causes of this species' decline.  On July 28, 2003, a proposed rule for critical
> habitat designation for the Peirson's milk-vetch was published in the Federal
> Register, and this rule included proposed designation in the project area of the
> proposed canal project.  FWS has informed the Secretary and Commissioner
> the lining project would "result in the loss of individuals and habitat" of the
> Peirson's milk-vetch.  Nonetheless, the Secretary and Commissioner have

failed and refused to supplement the FEIS to address this loss of habitat for an endangered species.
. . .
Defendants have not reinitiated ESA Section 7 consultation as required by regulation despite the clear existence of triggers that mandate such re-initiation.  Such factors include:  the listing under the ESA of a plant species, the Peirson's milk-vetch, that will be taken and damaged by the new canal project . . . .
. . .
The plant species, Peirson's milk-vetch, was listed after the completion of the 1994 FEIS.  The 1994 FEIS, and its appendices admit that this plant species is in the project area, which is under Federal jurisdiction.  The proposed project with [sic] harm the habitat of this species.

(Am. Compl. ¶¶ 42, 94, 96.)   Thus, that the critical habitat rule is new information or unlawful is not part of CURE's claims in the Amended Complaint..

Second, the court in Center for Biological Diversity does not consider habitat affected by the All-American Canal.  The agency action in Center for Biological Diversity occurred in subunits B and C of the Peirson's milk-vetch habitat considered for critical habitat designation.  Center for Biological Diversity, 422 F. Supp. 2d at 1144-45.  The All-American Canal project is located in subunit D of the area considered for critical habitat designation.  69 Fed. Reg. 47330, 47332 (Aug. 4, 2004).

Third, the court in the Center for Biological Diversity did not find FWS's final critical habitat rule "unlawful."  Rather the court determined that FWS's decision to exclude subunits B and C as Peirson's milk-vetch critical habitat was arbitrary and capricious.  Id. at 1144.  The court so held because FWS's determination that listing subunits B and C as critical habitat "would provide virtually no additional Federal Regulatory benefits . . . . ignored the recovery benefits of designating critical habitat" and the FWS relied on flawed economic analysis.  Id. at 1146, 1149-50, 1153, 1154.  On the other hand, FWS did not rely on those "flawed" reasons for excluding subunit D from the listing.  See 69 Fed. Reg. 47330, 47332,  47341 (Aug. 4, 2004).  FWS excluded subunit D from critical habitat listing because of subunit D's "relatively small size and separation from the other critical habitat subunits[,]" and the low numbers of Peirson's milk-vetch found within subunit D.  Id.

Finally, the habitat in subunit D has not been listed as critical habitat.  See id.  For these reasons, the district court's decision in Center for Biological Diversity does not constitute a new critical habitat legal fact requiring Reclamation to reinitiate consultation with FWS concerning the Peirson's milk-vetch.  Therefore, Plaintiff CURE has failed to go beyond the pleadings and point to a genuine issue of material fact triggering Reclamation's duty to reinitiate consultation with FWS.  For these reasons, the Court will grant Defendants' motion for summary judgment regarding Plaintiff CURE's Peirson's milk-vetch claims under the ESA.

## IV.  CONCLUSION

The impact of the All-American Canal Lining Project is significant for all parties to this action.  After nearly a year of hard-fought litigation, however, Plaintiffs as a matter of law cannot show entitlement to the injunctive and declaratory relief requested.

**IT IS THEREFORE ORDERED AS FOLLOWS:**

Federal Defendants' Corrected Opposition to Plaintiff's Motions for Summary Judgment or Preliminary Injunction, and in Support of Federal Defendants' Cross-Motion for Summary Judgment (Doc. #229) is hereby GRANTED and Judgment is hereby entered in favor of Defendants and against Plaintiffs.

Plaintiff CDEM's Motion for Summary Judgment, or alternatively for Preliminary Injunction (Doc. #155) is hereby DENIED.

Plaintiffs CURE and DCAP's Motion for Summary Judgment, or Alternatively, for Preliminary Injunction (Doc. #152) is hereby DENIED.

Defendant Intervenor Imperial Irrigation District's Cross-Motion for Summary Judgment and/or Stay of Action as to the First Amended Complaint (Doc. # 211) is hereby DENIED.

United States' Motion to Limit the Scope of Review to the Administrative Record and for Protective Order (Doc. #34) is hereby DENIED in part and GRANTED in part.  It is

denied as to limiting the scope of review to the Administrative Record and granted as to protecting Federal Defendants from discovery.

Plaintiffs' Motion to Supplement the Administrative Record (Doc. #99) is hereby DENIED in part and GRANTED in part.   It is denied as to discovery and granted as to allowing Plaintiffs to supplement the Administrative Record.

Federal Defendants' Motion to Strike Plaintiffs' Declarations and Documents (Doc. #218) is hereby DENIED.

Plaintiffs' Motion for Leave to Late File the Declaration of Craig Morgan in Support of Plaintiffs' Motion for Summary Judgment, or Alternatively, for Preliminary Injunction (Doc. #281) is hereby GRANTED.

Motion for Leave to File Oversized Brief by Plaintiffs CDEM and CURE (Doc. #156) is hereby GRANTED.

Federal Defendants' Amended Motion for Leave to File Overlength Brief (Doc. #227) is hereby GRANTED.

DATED:   July 3, 2006

_____

PHILIP M. PRO
Chief United States District Judge

58